OPINION OF THE COURT
Simons, J.
Petitioner appeals from an order finding it guilty of unlawful discrimination in discharging complainant, Moses Harary. Complainant originally charged that petitioner discriminated against him because of his creed and national origin. He subsequently amended the complaint to add the charge of retaliation. After a hearing, the administrative law judge found that complainant had failed to establish a prima facie case on the grounds stated. He permitted complainant to amend his complaint, however, to allege that he was discharged as the result of. his “race, color and ethnicity” because petitioner had applied an unlawful quota in determining which employees were to be discharged under its 1976 retrenchment policy. Pursuant to that amendment to the complaint, the administrative law judge found petitioner guilty of unlawful discrimination and awarded complainant substantial damages. The decision has been affirmed by the State Division of Human Rights, the Human Rights Appeal Board and the Appellate Division. We find no substantial evidence to support the division’s decision and order, however, and therefore grant the petition and dismiss the complaint.
Complainant is Jewish and American born. In 1972 he was hired as associate dean of administration and management planning by petitioner CUNY-Hostos Community College, a unit of the New York City Board of Higher *73 Education.[1] He received successive annual appointments to his position until 1975. It is important to this proceeding that he had no teaching duties and that he was not tenured.
In 1975 New York City suffered a severe financial crisis which caused the board of higher education to direct all 19 units under its jurisdiction to drastically reduce expenses (see, generally, Klein v Board of Higher Educ., 434 F Supp 1113). Indeed, conditions were so serious that it appeared for a time that CUNY-Hostos might be closed. A few months later, in July, the board issued a statement of policy to guide the units in retrenchment. Noting that the primary function of the board was education, it directed that economies, insofar as possible, were to be made by staff reductions in administrative positions rather than teaching positions. In August, 1975 petitioner’s president, Cándido de León, called complainant into his office with the dean of administration, told him that he was not satisfied with complainant’s understanding of how a university works (a reference apparently to antagonism between complainant and some faculty members) and told him to start looking for a new position. When complainant asked for a further explanation, de León told him the “reasons are anthropological but I do not want to go into them because you will just use them as a rationalization.” Complainant was told that he could have time to find a new job and in fact he was continued on the payroll until the end of the 1975-1976 school year. On July 28, 1976 he received notice that he would not be reappointed for the coming year.[2]
On July 21, 1976 President de León, as directed by the board of higher education, promulgated a retrenchment plan. The plan was subsequently revised in August, 1976, but for purposes of this appeal, both plans were the same. Under it, 15 employees, including petitioner, were discharged that fall. Eventually a total of 82 employees were *74 eliminated from the college, 33 by attrition and 49 by discharge.
On July 8, 1976 complainant filed charges with the division alleging that petitioner had unlawfully discriminated against him. After hearings extending over two years, the division found that there was “no credible evidence in the record to show that complainant was terminated because of malice based on his being Jewish and American-born”; that in fact President de León had hired complainant in 1972 knowing his religion and national origin. The division also found that under the retrenchment plan some American-born Jews were discharged and others retained and that the evidence in the record did not support complainant’s contention that he was discharged so that he could be replaced by a person representing a different racial or ethnic group. It found petitioner was not guilty of retaliation because complainant had been orally notified of his discharge before he filed his complaint. The division granted complainant relief because it found that he was discharged pursuant to the retrenchment plan and that the plan was “a deliberate effort to perpetuate unlawful quotas based on ethnicity of employees.”
Section 296 (subd 1, par [a]) of the Executive Law provides that it shall be an unlawful discriminatory act to discharge an employee because of age, race, creed, color, national origin, sex, disability, or marital status. Its purpose is to avoid discriminatory preference for any group, minority or majority, in hiring and firing. Neither the statute, the division’s regulations nor any case law cited to us refers to unlawful employment quotas or a prohibition against them, but most people have a sense of the wrong. The words refer to percentages applied to redress or maintain an existing proportion of the work force. The evil of quotas is that they subordinate merit as a basis for hiring and business judgment (which includes consideration of the ability of the employee) as the basis for discharge. Instead, arbitrary percentages are used to maintain a certain ethnic or religious balance. In quota discharges, the wrong consists of singling out employees for discharge, not because of a valid business judgment, but because the employees’ identities as members of a group are necessary *75 to maintain a statistical relationship among the employee groups remaining. The discharge acts as a preference for those retained and is a form of unlawful discrimination.
• Complainant’s claim on this appeal is that he was discharged to maintain the racial balance of the groups employed by petitioner. In examining the evidence to support his claim, our review is limited to a consideration of whether the division’s determination in complainant’s favor is supported by substantial evidence on the record. We may not weigh the evidence or reject its choice where the evidence is conflicting and room for a choice exists. When a rational basis for the conclusion approved by the division is found, the judicial function is exhausted (see 300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 181; State Div. of Human Rights v Columbia Univ. in City of N. Y., 39 NY2d 612, 616; Matter of Pace Coll. v Commission on Human Rights of City of N. Y., 38 NY2d 28, 35).
The division, in finding that petitioner implemented an illegal quota has relied on a statistical racial analysis included in President de Leon’s retrenchment plan, his remark to complainant in 1975 that his discharge was for “anthropological reasons”, and his hearing testimony that he was concerned that his plan should not penalize any ethnic group.
The retrenchment plan of 1976 was an ad hoc document devised to meet an extraordinary financial crisis. It called for an extensive reorganization of the college’s facilities and staff intended to achieve annual savings exceeding $1,000,000 in petitioner’s budget. The personnel and budget committee of the college, which included the chairpersons of all departments and voting representatives of the student government, had reviewed it and it was discussed with various deans and program directors and with the business manager of the college. As a part of the plan, six departments were eliminated. Some of the employees of these departments were discharged and some were transferred to other departments or other community colleges. Reductions were made in administrative and service areas as much as possible with preference given to retaining the teaching staff. Of the seven individuals holding positions *76 as deans (some of whom had tenure), two were retained, four were reassigned to teaching duties and complainant was discharged. All those retained were required to teach classes. President de Leon’s explanation of the decision to discharge complainant rather than others was that complainant had no tenure and he was the dean the college could lose with least damage to its programs because his educational background did not qualify him to teach any courses offered by the college.[3] Moreover, because he had been given notice of his discharge orally a year earlier, it was only natural that he should be included in the retrenchment plans in 1976. The division apparently accepted this explanation because it found no discrimination directed at complainant personally.
The written explanation of the plan recapitulated the jobs and functions changed and showed the estimated savings expected from each. At the end of it, the president noted he had discussed the changes with the college’s affirmative action office and he set forth the effects of the retrenchment on the racial mix of employees both before and after retrenchment and also the racial mix of those discharged.
“The consequences of this ‘Retrenchment Plan’ were discussed with the Affirmative Action Office.
“No significant difference will take place in the ethnic distribution of the faculty as a result of this plan and all of the other changes due to resignations, non-reappointments, etc. The total numbers affected by retrenchment and all other changes are as follows:
*77 ‘Ethnic Group Number %
White 27 33
Black 24 29
Hispanic 26 32
Asian/Pacific Islander 5 6
Total 82 100%
“The ethnic distribution resulting from all of these changes compared to this spring’s ethnic distribution is as follows:
March, 1976 For September, 1976
‘Ethnic Group Number % Number %
White 101 29.4 74 28.5
Black 95 28.0 71 27.3
Hispanic 135 39.4 109 41.9
Asian/Pacific Islander 11 3.2 6 2.3
Total 342 100.0 260 100.0
“The percentage of women on the entire faculty and staff will go down by 4.4%. This should not be surprising given the retrenchment of the Nursing Department, most of whose instructors are always women.
* * *
“The proportion of women in each ethnic group, however, has remained stable.”
The division has relied heavily on this statistical analysis to establish its finding that petitioner discharged complainant to satisfy an unlawful quota. It seems apparent, however, that the analysis is more a report of the results after formulating the plan of retrenchment than a design for retrenchment, and this is confirmed by the only reference to employment by sex. The chart showed women, also a target for affirmative action, would be affected disproportionately, indicating that the analysis was a review of the effect of the proposal, not a guide for the decisions previously made. Moreover the analysis contained no reference to religious preferences.
*78 But more fundamentally, when the statistics are examined they do not establish a prima facie case of discriminatory discharge based upon a quota. In so stating, we recognize that statistics have a place in discrimination cases (see Matter of New York City Bd. of Educ. v Batista, 54 NY2d 379, 383; Matter of Pace Coll. v Commission on Human Rights of City of N. Y., 38 NY2d 28, 36, supra; State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201, 210; and see New York Tr. Auth. v Beazer, 440 US 568, 587; McDonnell Douglas Corp. v Green, 411 US 792, 805). When used with other objectively established evidence, they may permit an inference of unintentional discrimination. Thus, when the results of acknowledged past hiring practices are compared to statistics of the available labor pool and show a consistent underrepresentation of a particular minority group in the labor pool, an inference of discrimination is permissible (see, e.g., State Div. of Human Rights v Kilian Mfg. Corp., supra). A statistical predicate alone, however, will not support a challenge (Matter of Pace Coll. v Commission on Human Rights of City of N. Y., supra, at p 36). There must be proof also of employment practices which warrant the conclusion that discrimination exists (see State Div. of Human Rights v Kilian Mfg. Corp., supra). Moreover, statistics, even when supported by other established objective evidence, will not support an inference of unlawful employment practices unless they rest on a sufficient data base and are adjusted to reflect various factors which may influence the reliability of the numbers, e.g., the history of employment practices, the available labor pool, the rate of turnover, the effect of tenure, and the nature of the employment. In this case, there is the additional factor that the courts traditionally are reluctant to oversee academic judgments. Indeed, we have acknowledged that subjective factors may be considered in making faculty employment decisions (see Matter of Pace Coll. v Commission on Human Rights of City of N. Y., supra, at p 38).
Applying these considerations, we hold that the division erred in accepting these statistics at face value and inferring discrimination based upon them. Importantly, the statistics were based upon a single program undertaken to *79 meet an unusual emergency. The record fails to disclose that it was symptomatic of past practices or that it required the discharge of whites other than complainant; the division found that others of similar ethnic background and religion had been retained at the college. Moreover, the figures and positions affected were not final. They were subject to change after review and appeal by affected employees and what changes, if any, were made after these appeals does not appear. Finally, the division failed to take into consideration petitioner’s historical affirmative action hiring practices and its obvious success in maintaining a faculty of diverse backgrounds and cultures. Given this prior history and the scope of retrenchment, some statistical correlation between those retained and those discharged was inevitable under accepted rules of probabilities and militates against an inference based upon the report that complainant’s discharge was motivated by the desire to maintain a quota. In short, while in some cases statistical evidence when corroborated by other objective evidence may support a reasonable inference of discrimination, the statistical evidence here does not.
The division also relied upon the president’s statement in 1975 that complainant’s discharge was for “anthropological reasons”. That statement was ambiguous at best and the division did not find it to be evidence of discrimination when it dismissed complainant’s original charges.
Finally, the division relied upon statements made by President de León during his testimony at the hearing in which he expressed his knowledge of the ethnic makeup of the college and his concern that retrenchment not unduly penalize any group. Neither of these proves discrimination. The board of higher education had an established policy of affirmative action employment and its 1975 statement of policy directed that in making reductions in staff due regard should be given it.[4] Manifestly, petitioner and its officers were aware of this policy and of the antidiscrimination laws. The college maintained an affirmative action office which, among other duties, compiled ethnic and *80 gender data about employees and reported it annually to the United States Department of Labor to qualify petitioner for Federal assistance (see 41 CFR part 60-2 et seq.). Thus, the president’s testimony that petitioner wished to avoid penalizing any minority by this retrenchment, his statement in the plan that he had discussed the discharges with the college’s affirmative action office and his inclusion of a statistical analysis which demonstrated that as a result of the plan there would be little change in the racial balance of the university’s employees, far from being proof per se of unlawful discrimination, was entirely consistent with his sensitivity to discrimination as the law and university policy required him to be. It should not have been parlayed into a new and different claim of discrimination by the administrative law judge after the evidentiary hearing was closed. It is noteworthy that this was not the only discrimination claim filed against petitioner by disappointed employees of various racial backgrounds after the 1976 retrenchment and it is not difficult to imagine the contentions that would have been raised if a disproportionate number in one or another racial group had been discharged. Petitioner was entitled to consider that aspect of the problem also.
Complainant, and Judge Fuchsberg in dissent, have relied upon evidence produced in support of the original charges that there was prejudice or bias against complainant personally to support this charge. The division rejected that evidence. On the sustained charge of discrimination based upon quota discharges, the evidence in the record established little more than the results of the 1976 retrenchment plan and the fact that petitioner was satisfied with those results. That evidence does not warrant a conclusion of unlawful discrimination.
Accordingly, the order of the Appellate Division should be reversed and the petition should be granted.

. City University of New York was known as the Board of Higher Education of the City of New York at the time of these proceedings (see Education Law, § 6203).

. In a separate article 78 proceeding, complainant has recovered his salary for the 1976-1977 academic year because petitioner failed to give him timely notice of his nonreappointment as required by university by-laws.

. Contrary to the statement of Judge Fuchsberg (dissent, at p 85), the record contains no evidence of “guidelines” requiring discharge “ ‘in inverse order of length of full-time continuous service’ ”. The division found that, “in the main”, that policy was to be followed. In so stating, it relied upon a statement found in a decision by District Judge Pollack in Klein v Board of Higher Educ. (434 F Supp 1113). Judge Pollack stated that the guidelines provided that among instructional personnel seniority was to be followed, that within a given department nontenured personnel were to be discharged first, and that seniority could be disregarded among nontenured personnel for special educational reasons (Klein, supra, at p 1115). Those guidelines appear to have been followed by petitioner. Complainant was not instructional personnel and he was not tenured. The 1976 retrenchment plan, including the plan formulated by CUNY-Hostos, was upheld by the court in Klein.

. Education Law (§ 6201, subds 2, 3), enacted subsequent to the incidents here, expressly direct the college to pursue affirmative actions to achieve an ethnically and racially diverse faculty and student body.