◼ In the Matter of NEW YORK CITY BOARD OF EDUCATION, Petitioner, v ELLSWORTH E. SIMLEY et al., Respondents. — Proceeding pursuant to section 298 of the Executive Law to review an order of the State Human Rights Appeal Board, dated October 29, 1981, which affirmed an order of the State Division of Human Rights, dated October 8, 1980, which, after a hearing, *inter alia,* held that petitioner discriminated against the complainants, Ellsworth E. Simley and Charles A. Staten, by refusing them retention rights as evening community center per-session teachers in school districts Nos. 13 and 19, respectively, and awarded them back pay. Petition granted to the extent that the determination in favor of complainant Simley, and so much of the determination in favor of complainant Staten as awarded him damages are annulled, on the law, without costs or disbursements. Proceeding otherwise dismissed and matter remitted to the respondents for further proceedings consistent herewith. Complainant Ellsworth E. Simley was licensed by the New York City Board of Education as a teacher of health education in playgrounds. Complainant Charles A. Staten was licensed as a teacher of physical education and recreation in community centers. Both were employed for years as per-session

teachers in after-school and summer vacation programs auxiliary to the regular day school programs of the board. On November 13, 1974 the board promulgated special circular no. 33 which set forth its interpretation of the limited retention rights of per-session teachers provided by the ·1972-1975 collective bargaining agreement between the United Federation of Teachers (hereinafter UFT) and the board. Retention rights are the rights of a per-session teacher to priority in retaining his per-session position and are analogous to the tenure rights provided by statute for regular day school teachers. As interpreted by the board, retention rights were restricted to the per-session teachers who were regularly employed in the board's regular day school program. Neither of the complainants was a regular day school teacher. Simley and Staten, who are black, filed complaints with the State Division of Human Rights (hereinafter Division), charging the board and the UFT, *inter alia,* with unlawful discriminatory practices relating to employment on the basis of race and color. The new collective bargaining agreement, effective in September, 1975, admittedly provided retention rights for all per-session teachers irrespective of whether they were regular day school teachers but the board did not promulgate a circular to that effect until September 6, 1977. Simley and Staten, however, were unable to obtain per-session positions in the evening community center programs in their respective districts for the 1975-1976 per-session year which began in September, 1975. The Division found that the rules promulgated in special circular No. 33 were not discriminatory, except for the provision that only teachers regularly employed in the regular day school program were entitled to claim retention rights. The Division further found that that provision represented only the board's, not the UFT's, interpretation of the 1972-1975 collective bargaining agreement. Therefore, it dismissed the complaints with respect to the UFT. On the basis of statistical evidence with respect to two of New York City's 32 school districts, the Division found that special circular No. 33, in mandating "that only per-session teachers regularly employed as day school teachers could claim retention rights, disparately affected black evening per-session teachers who were not employed as regular day school teachers". The Division noted that each per-session teacher "who held a retention license took an examination specifically related to the duties they performed in the evening community centers" and that "persons who held any day school license * * * may have been licensed as teachers" of subjects not "related to the functions of the positions of after school and evening community center per-session teachers". The Division decided that the New York City Board of Education discriminated against the complainants, in "refusing them retention rights as evening community center per-session teachers" in their respective school districts in accordance with circular No. 33, which disparately affected black evening community center per-session teachers who did not hold day school licenses, and awarded them compensatory damages. It found that but for "the discriminatory effect of Circular 33 upon Complainant Ellsworth Simley, he would have been granted retention rights as an evening per-session teacher * * * in District 13, and accordingly, would have worked in the 1975-1976 per-session year, and in the succeeding per-session years that the evening community centers in District 13 were in operation, consistent with the number of years of retention rights to which he was entitled". A parallel finding was made with respect to Staten. As to complainant Simley, these findings are not supported by substantial evidence. There is no proof that the evening community centers in district No. 13 were in operation during the 1975-1976 and 1976-1977 per-session years and the only relevant evidence is to the contrary. Both complainant Simley and his former supervisor, James Coward, testified that there were no programs in the evening community centers in the district during those two years due to the

lack of funds. By the terms of the 1975-1977 collective bargaining agreement, Simley lost his retention rights after there were no programs for two years, and he could be considered for selection only if no qualified day school teachers were available. Accordingly, it is not necessary to consider the evidence tending to establish that the license as a substitute teacher of health education in playgrounds issued to Simley on November 14, 1945 was terminated on October 29, 1952. As to complainant Staten, the determination that the board discriminated against him by refusing him retention rights as an evening community center per-session teacher in district No. 19 should be confirmed, but not for the reason advanced by the Division. There was a program in the evening community center in district No. 19 in 1975-1976. Staten testified that when he applied for a position, his supervisor, Allan Grossman, told him that he had no retention rights, and that he should "go to the Human Rights Commission to get my job. It was a big joke". The hearing at the Division began on December 15, 1975. Shortly afterwards, because of action taken by a representative of the board of education, Grossman gave Staten a work assignment of one night a week for the months of May and June, 1976. When Staten asked why he could not get more work assignments, as the center was open every night, Grossman told him he would have to go to the Division and maybe it would give him more nights. In the 1974-1975 per-session year, Staten had been employed in the evening program for 134 hours. When Staten applied for employment for the 1976-1977 per-session year Grossman again advised him that he had no retention rights and to go to the Division to see if it could do something for him. According to Staten, he was refused work at the beginning of the 1975-1976 year because he was black and in retaliation for his having filed a complaint with the Division in February, 1975. The supervisor of the per-session unit in the board's division of personnel, Malka Weitman, testified that the board was adhering to the provision in the 1975-1977 agreement that teachers not regularly employed in the regular day program are entitled to retention rights, notwithstanding the fact that, due to "internal problems" no new circular was promulgated. According to Ms. Weitman, the supervisors were responsible for reading applicable portions of a new contract and were required to implement changes in the contract before they received a circular from the board. Ms. Weitman received only applications for per-session work which had been forwarded by the supervisors for review, that is, the applications of those whom the supervisors wanted to hire. Staten testified that he filled out an application for work for the 1975-1976 school year in which he claimed retention rights. Staten's supervisor Allan Grossman did not testify. There was, therefore, sufficient evidence to support the finding that the board of education discriminated against Staten by refusing him retention rights as an evening community center per-session teacher in district No. 19 (Executive Law, § 296, subd 1, par [a]). Further, there is no merit to the argument that the Division erred when it permitted Staten to reinstate his complaint after he executed a stipulation of discontinuance, since that stipulation was never approved by the commissioner (see 9 NYCRR 465.14). The award to Staten, however, may not be confirmed, as the award is compensatory (Executive Law, § 297, subd 4, par c, cl [ii]), and the Division failed to take into consideration Staten's duty to mitigate his damages. The Division awarded Staten a "sum of money equal to the maximum amount earned by any such day school teacher, employed in the evening session in district No. 19 from September, 1975 to the date of the order, who had a lesser number of years of retention rights than Complainant Staten, and who worked during said period when Complainant Staten did not work", subject only to the proviso that the amount paid "not exceed the money equivalent of 270 hours in any one per-session school year" (approximately $3,500). Staten has been employed as a

New York State parole officer since 1970 and while so employed he also worked continuously in the evening school program until 1974. The award should, therefore, be reduced only by the amount that Staten earned or could have earned from any evening employment for the period in question. Under this view of the case, it is unnecessary to consider whether the statistical evidence received by the Division may support a reasonable inference of discrimination (cf. *Matter of CUNY-Hostos Community Coll. v State Human Rights Appeal Bd.*, 59 NY2d 69). We note for the record, however, that out of New York City's 32 school districts, the Division relied on statistical evidence as to only districts Nos. 16 and 19, both in Brooklyn. In district No. 16, during the 1974-1975 school year, 37 teachers were employed in the evening program, 5 of whom were white and 32 of whom were black. All of the white teachers, but only 8 of the 32 black teachers, were employed in the regular day school program. In district No. 19, for the 1974-1975 school year, 43 of the teachers employed in the evening community centers were white and 21 were black. Of the 43 white teachers, 34 held day school licenses, and 10 of the 21 black teachers held day school licenses. In the after school centers, in district No. 19, all of the 59 teachers, 56 of whom were white and 3 of whom were black, held day school licenses. While "statistics have a place in discrimination cases" and may "[w]hen used with other objectively established evidence * * * permit an inference of unintentional discrimination * * * statistics, even when supported by other established objective evidence, will not support an inference of unlawful employment practices, unless they rest on a sufficient data base" (*Matter of CUNY-Hostos Community Coll. v State Human Rights Appeal Bd., supra,* p 78). Even if the data base were sufficient, there is no proof that special circular No. 33's restriction of retention rights to day school teachers had a disproportionate impact on black per-session teachers after August 31, 1975. The evidence is to the contrary. Further, neither of the complainants was discriminated against through August 31, 1975. The only evidence presented as to the composition of the staff of an evening community center in 1975-1976 was for district No. 16. Of the 37 teachers (5 white and 32 black) employed in the evening program in district No. 16 during the 1974-1975 academic year, 14 were employed in the evening program during the 1975-1976 academic year. Of these 14, 4 were white and 10 were black. *Notwithstanding the fact that there were 8 teachers with day licenses in the group of 37, none of the 10 black teachers employed in 1975-1976 had a day license,* and *all* of the teachers employed in 1975-1976, white and black, had *more seniority* than the teachers who were not employed. O'Connor, J. P., Weinstein, Bracken and Boyers, JJ., concur.