■ JOHNNIE L. RUSH, Petitioner, v STATE HUMAN RIGHTS APPEAL BOARD, Respondent. — Proceeding pursuant to Executive Law § 298 to review an order of the respondent State Human Rights Appeal Board, dated December 30, 1983, affirming an order of the State Division of Human Rights, dated July 1, 1982, dismissing the petitioner's complaint upon a finding that there was no probable cause to believe that Golden Gate Associates, Inc., had engaged or was engaging in an unlawful discriminatory practice against the petitioner.

Petition granted, without costs or disbursements, order annulled, on the law, complaint reinstated, and matter remitted to the State Division of Human Rights for a public hearing pursuant to Executive Law § 297 (4) (a).

By verified complaint, dated December 7, 1978, Johnnie L. Rush, the petitioner, instituted a proceeding against Golden Gate Associates, Inc. (Golden Gate), alleging that Golden Gate discriminated against him on the basis of race and color in connection with his purchase of a house, in violation of Executive Law article 15, popularly known as the Human Rights Law (Executive Law § 290 *et seq.*). Specifically, the petitioner, who is black, alleged that in September 1977, he "put down a binder" for a house which was to be built by Golden Gate. The contract of sale was not executed until April 1978 because, according to the petitioner, Golden Gate "cancelled several dates during this time". The contract provided, *inter alia,* that the petitioner's house was to be completed by December 1, 1978. However, as of the date of the complaint, the petitioner's house was "not complete while Caucasians who ha[d] bought after [he] did ha[d] their houses complete and [were] living in their homes". The petitioner concluded that he was the victim of unlawful discrimination "because of [his] race and color". Title did not in fact pass until January 1979.

The State Division of Human Rights (the Division) investigated the allegations. An investigatory conference was held on December 18, 1978, attended by the petitioner, Golden Gate's secretary (Martin Yedfarb) and assistant secretary (Myron Dubow, who was also Golden Gate's counsel), and the Division's Regional Director. In support of his allegations that he was the victim of unlawful discrimination, the petitioner submitted copies of several letters written by his attorney concerning, *inter alia,* the delays in scheduling a date for executing the contract.

The petitioner also complained that though "he was the first to put his binder down * * * three other houses owned by Caucasians have been completed". The petitioner also pointed to Golden Gate's insistence that he sign an escrow agreement in connection with uncompleted landscaping and an additional charge of $2,000 to be paid by him at the closing as evidence of racially motivated harassment.

Golden Gate denied the allegations of unlawful discrimination. It explained that the houses were constructed in a particular order "because of the topography of the land and the location of the sites". Moreover, the petitioner's site was not as accessible as the other sites because the road leading to the petitioner's site could not accommodate the cement trucks. Golden Gate also stated that "[t]he only thing impeding * * * a closing date * * * is the [petitioner's] unwillingness to sign an escrow agreement". Contracts and binders on two lots adjoining the petitioner's lot were submitted by Golden Gate to establish that the delay in the petitioner's closing was not inordinate.

By a determination after investigation, dated July 17, 1981, the Regional Director of the Division determined that "there is probable cause to believe" that Golden Gate "engaged in or is engaging in" an unlawful discriminatory practice as alleged by the petitioner and recommended that a public hearing be conducted.

The Regional Director's determination was based on the following findings set forth in her memorandum to the determination after investigation:

"The [petitioner] is Black. He selected a house which was to be built on a site he selected in Sept. 1977. Delays forced the contract signing to be held in April 1978. These delays were caused by [Golden Gate].

"The [petitioner] offered all cash in an area which is almost entirely White. Finally, after other lots were sold and building started on Caucasian owned sites, his house was started in August after he had paid a private detective to take pictures. He planned to pay all cash so there was no problem with a mortgage application. This is the third section to be built and includes sixty-three (63) homes. Two other houses have been sold to Black families. They are located about 1 block away from the [petitioner's]. It is quite clear that the delays enabled the builders to locate White families securely before letting the [petitioner] be observed by White buyers. The [petitioner's] closest neighbors moved in almost six months before he did. He is adamant about the treatment he received and completely believable."

On March 12, 1982, the Commissioner, based on the recommendation of the Division's case review unit, vacated the Regional Director's probable cause determination and reopened the matter for further investigation. As part of the reopened investigation, field visits were to be conducted "to determine from other purchasers White and Black time lapse between binder and contract and whether house completed [sic] to satisfaction/contract".

Pursuant to this directive, a human rights specialist at the Division, Ms. Harriet Mellis, sent questionnaires to the petitioner's six Caucasian neighbors, which questionnaires Ms. Mellis requested them to complete. Having received no response to her inquiries, Ms. Mellis contacted four of the six neighbors by telephone. Three of the neighbors disclosed, *inter alia,* that two to five weeks elapsed between binder and contract; one neighbor stated that a binder was given in the summer of 1977 and the contract date was October 26, 1977.

The petitioner responded by letter to the Commissioner's order vacating the probable cause determination and reopening the investigation, in which letter he repeated his allegations of unlawful discrimination by Golden Gate. Significantly, he added: "Subsequent caucasians purchasers was [sic] not given the run around as I was given. [Golden Gate's] allocations [sic] that the location of my property compelled [the builder] to build the other houses first holds no water since the road was already constructed before any houses were built and the trucks delivering materials had to pass my house before they could get to the other houses. If anything since the truck had to pass my house first and since I placed a binder deposit before most of the subsequent purchasers, my house should have been one of the first houses completed. Only [Golden Gate's] refusal to enter into contract with me caused the delay for the completion of my house". Also significant is the fact that the petitioner had to wait approximately seven months between binder and contract.

After completing her field investigation, Ms. Mellis recommended a finding of no probable cause to support the petitioner's complaint. The determination was based on the following findings. First, Ms. Mellis stated that "[t]here was a considerable range in the time lapse between binder and contract. One person had a time span of only two weeks while another had almost five months. The most recent purchase, which occurred after [the petitioner] had occupied his house was five weeks". However, the record discloses that the owner of lot 14 waited about one month between binder and contract. The owners of lots 12 and 13 reported that they went to contract some two to three weeks

after the date of their binders. The time span on lot 17, which Ms. Mellis found to be "almost five months", is unascertainable since the binder date given was the summer of 1977, and the owner of lot 17 stated that he had first selected one property, then another. Moreover, the Division did not ascertain the actual dates pertaining to the purchase of lot 17 nor the time span for lots 16 and 18, of which the Division had previously expressed an interest.

Second, in connection with the petitioner's allegation that lot 17 was purchased after but completed before his house, Ms. Mellis unequivocally stated that, "[t]he record shows that #17 * * * was on a binder two months before [the petitioner] signed his binder and was completed two months before [the petitioner's] house". As previously indicated, the owner of lot 17 reported that he put a binder down in the summer of 1977 and that the binder was for one property, then another. Accordingly, Ms. Mellis' finding that lot 17 was on a binder two months before the petitioner's property is not supported by the record, as it is unclear as to precisely when the binder was given on lot 17. With regard to the date of the closing on lot 17, Golden Gate's own submission reveals that lot 17 went to title fully three months before the petitioner received title to his house.

Third, Ms. Mellis pointed out that "#12 and #16 both went to contract in March 1978, one was completed in October 1978 and the other in November 1978, the same time span as [the petitioner's] house. The promised completion date of [the petitioner's] house was December 1978 and it actually went to closing in January 1979". Initially we note that Ms. Mellis never contacted the owner of lot 16 and did not verify the dates pertaining to that lot by her own independent investigation. Furthermore, review of the documentation submitted by Golden Gate to the Division reveals that lot 16 went to contract on March 1, 1978 and the owner took title on October 26, 1978 — a time span of seven months, 25 days. Lot 12 went to contract on March 24, 1978 and title passed to the owner on November 10, 1978, for a total of seven months, 17 days. The petitioner, however, went to contract on April 6, 1978 and took title on January 24, 1979, for a time span of nine months and 18 days. Accordingly, Ms. Mellis' findings that the owners of lots 12 and 16 waited as long as the petitioner for the completion of their houses is unsupported by the record.

Notwithstanding the inadequacies in the record, the Regional Director concurred with Ms. Mellis' recommendation and, by order dated July 1, 1982, the petitioner's complaint was dismissed on the ground that "the Division of Human rights has

determined * * * that there is NO PROBABLE CAUSE to believe that [Golden Gate] engaged in or was * * * engaging in the unlawful discriminatory practice complained of". On appeal, the respondent State Human Rights Appeal Board affirmed.

The pivotal question in this proceeding is whether the Division's determination is supported by substantial evidence in the record (*see, Matter of New York City Bd. of Educ. v Batista,* 54 NY2d 379, 384-385; *Matter of CUNY-Hostos Community Coll. v State Human Rights Appeal Bd.,* 59 NY2d 69, 75; *Matter of Murapa v Kramarsky,* 88 AD2d 1009). However, in reviewing the record for evidence of unlawful discrimination, "it must be kept in mind that 'discrimination is rarely so obvious or its practices so overt that recognition of it is instant and conclusive, it being accomplished usually by devious and subtle means'" (*Matter of New York City Bd. of Educ. v Batista, supra,* p 383, quoting from *300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176, 183).

Our review of the record persuades us that the petitioner's allegations had sufficient substance to at least warrant a public hearing (*see,* Executive Law § 297 [4] [a]). The findings of the human rights specialist, upon which the no probable cause determination was based, were in many instances either inaccurate or without support in the record (*see, Steins v State Div. of Human Rights,* 86 AD2d 795, *appeal dismissed* 56 NY2d 805). Moreover, even assuming that the factual predicates relied upon by the human rights specialist were correct, the petitioner has established that the delays experienced by his white neighbors were not comparable to the delays he suffered.

In light of our disposition, we need not pass on the remaining contentions.

Accordingly, the order of the State Human Rights Appeal Board should be annulled and the matter remitted to the Division for a public hearing. Mollen, P. J., Gibbons, Thompson and Bracken, JJ., concur.