[882 NYS2d 458]

In the Matter of ARGYLE REALTY ASSOCIATES, Petitioner/
Respondent, v NEW YORK STATE DIVISION OF HUMAN RIGHTS,
Respondent/Cross-Petitioner, et al., Respondents.

Second Department, June 30, 2009

## APPEARANCES OF COUNSEL

*Leonard J. Falcone*, Hempstead, for petitioner/respondent.

*Caroline J. Downey*, Bronx (*Peter G. Buchenholz* of counsel), for New York State Division of Human Rights and another, respondent/cross-petitioner and respondent.

## OPINION OF THE COURT

BELEN, J.

The Commissioner of the New York State Division of Human Rights (hereinafter the Division) found that the petitioner had discriminated against the complainant employee, Ivette Rivera, on the basis of her pregnancy, and awarded damages to the complainant. The principal issue in this proceeding is whether the number of employees of the petitioner's interrelated entities may be aggregated to meet the four-employee statutory minimum required to be deemed an "employer" under Executive Law § 292 (5). We find that they may, and adopt the "single employer doctrine" originally promulgated by the National Labor Relations Board and adopted by federal courts analyzing the 15-employee statutory minimum required under the federal statutory counterpart to New York's antidiscrimination statute. This minimum number of employees is also known as the employee-numerosity requirement, which must be met before an entity will be deemed an "employer" under title VII of the Civil Rights Act of 1964 (42 USC § 2000e [b]).

In this proceeding, the petitioner Argyle Realty Associates (hereinafter Argyle Realty) seeks review of a determination of the Commissioner of the Division (hereinafter the Commissioner) dated June 22, 2007, which adopted the recommendation and findings of an administrative law judge (hereinafter the ALJ) dated March 22, 2007, finding that the petitioner discriminated against the complainant in the terms, conditions, and privileges of employment on the basis of her pregnancy, and awarded her damages in the principal sum of $15,000 for mental anguish and humiliation and the principal sum of $1,956 for back pay, with predetermination interest accruing only on the award for back pay from April 15, 1996. The Division cross-petitions to enforce the determination.

The petitioner, Argyle Realty, identifies itself as a limited partnership which owns six apartment buildings on Argyle Road in Brooklyn. Argyle Realty identifies its general partner as G-P

Argyle Corp. (hereinafter G-P Argyle), which the parties sometimes refer to as G.P. Argyle Corp. The sole officer, director, and shareholder of G-P Argyle is Theodore Dalmazio, who also serves as the manager and chief operating official of Argyle Realty, and holds himself out as the "president" of Argyle Realty. Dalmazio is also the majority shareholder in DAL Management Corp. and DAL Realty Management Corp. (hereinafter together DAL Management), which manage properties owned by Argyle Realty, among others.

The evidence adduced at the hearing before the ALJ was in sum and substance as follows: In or about 1992, Argyle Realty hired the complainant to be the superintendent of four of its buildings. In May 1995 the complainant became pregnant. In November 1995 the complainant was told to paint an apartment in one of Argyle Realty's buildings. However, the tenant of the apartment, upon learning of the complainant's pregnancy, refused to allow the complainant to paint. Shortly after this incident, Dalmazio terminated the complainant's employment. The complainant testified that Dalmazio terminated her employment because of her pregnancy, while Dalmazio testified that he did so because the complainant, without authorization, allowed nonemployees to perform her duties. In September 1996 the complainant secured new employment as the superintendent of a building across the street from one of the buildings she had maintained for Argyle Realty.

After her termination from employment, the complainant filed an administrative complaint with the Division alleging that her employment was improperly terminated on the basis of her pregnancy, and, thus, on the basis of her sex, in violation of Executive Law § 296 (1). Argyle Realty moved to dismiss the administrative complaint on the ground that it was not an "employer" within the meaning of Executive Law § 292 (5), which requires an "employer" to have four or more employees, since at the time of the alleged discrimination in 1995, it had only three employees. After a public hearing, the ALJ found that Argyle Realty, G-P Argyle, and DAL Management were interrelated entities, with common ownership and financial control, and that the employees of those entities—which collectively numbered at least four—should be aggregated for jurisdictional purposes. Consequently, the ALJ found that Argyle Realty was an "employer" within the meaning of Executive Law § 292 (5), and therefore subject to article 15 of the Executive Law (see Executive Law § 290 et seq.), commonly known as the Human Rights Law (see Executive Law § 290 [1]).

On the merits, the ALJ found that the complainant was unlawfully discriminated against in the terms, conditions, and privileges of employment on the basis of her pregnancy. The Commissioner adopted the alternate proposed order submitted by the Division's adjudication counsel, which was substantially similar to the ALJ's findings, and which recommended awarding the complainant, inter alia, the sum of $15,000 for mental anguish. Argyle Realty thereafter commenced the instant proceeding pursuant to Executive Law § 298 in the Supreme Court, Kings County, to review the Commissioner's determination and the Division cross-petitioned to enforce the determination. The matter was thereafter transferred to this Court pursuant to the Executive Law.

Executive Law § 292 (5) recites that "[t]he term 'employer' does not include any employer with fewer than four persons in his employ" (see DeStefano v Kopelman, 265 AD2d 446 [1999]). Relying on its 1995 payroll records, Argyle Realty alleges that it is not an "employer" within the meaning of Executive Law § 292 (5) because it did not have more than three employees. Further, Argyle Realty contends that the employees of DAL Management as of 1995 cannot be aggregated with its own three employees as of 1995 for purposes of determining the four-employee minimum, and that it is therefore not subject to the Human Rights Law.

While Argyle Realty's payroll records suggest that it employed three or fewer employees in 1995, for the reasons set forth below, we find that the number of employees of Argyle Realty, G-P Argyle, and DAL Management may be aggregated to satisfy the four-employee minimum of the Human Rights Law. In so holding, we adopt the "single employer doctrine" used in similar cases interpreting title VII of the Civil Rights Act of 1964 (hereinafter title VII) (see 42 USC § 2000e et seq.).

Preliminarily, reliance on the interpretation of title VII by federal courts is appropriate. The New York Court of Appeals has explained that

> "[t]he Human Rights Law . . . seeks to remedy the same type of discrimination as its federal counterpart—title VII of the Civil Rights Act of 1964. We have acknowledged the similarities and attempted to resolve federal and state employment discrimination claims consistently. Because both the Human Rights Law and title VII address the same type of discrimination, afford victims similar forms of

redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful to the resolution of [an] appeal" (*Matter of Aurecchione v New York State Div. of Human Rights*, 98 NY2d 21, 25-26 [2002] [citations omitted]).

In addition, "[t]he standards for recovery under the New York State Human Rights Law are the same as the federal standards under title VII of the Civil Rights Act of 1964" (*Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 305 n 3 [2004] [citations omitted]; *see* 42 USC § 2000e-2; Executive Law § 296; *Ferrante v American Lung Assn.*, 90 NY2d 623, 629 [1997]; *Nelson v HSBC Bank USA*, 41 AD3d 445 [2007]).

Ordinarily, in order to be deemed an "employer" under the title VII employee-numerosity requirement, an entity must employ a minimum of 15 persons (*see* 42 USC § 2000e [b]).[1] However, numerous federal courts have since applied the "single employer doctrine," first articulated by the National Labor Relations Board (hereinafter the NLRB) in 1956 (21 NLRB Ann Rep at 14-15 [1956]), to determine whether an entity with fewer than 15 employees may nevertheless be deemed an "employer" within the meaning of 42 USC § 2000e-2 by aggregating the number of its employees with those of any interrelated entities.

The United States Supreme Court first adopted the single employer doctrine in the context of labor disputes brought before the NLRB in *Radio & Television Technicians v Broadcast Service of Mobile, Inc.* (380 US 255, 256 [1965]). As the United States Court of Appeals for the Second Circuit (hereinafter the Second Circuit) thereafter explained, the original purpose of the doctrine was "to protect the collective bargaining rights of employees and to advance industrial stability" (*Murray v Miner*, 74 F3d 402, 404 [1996]). In the civil rights context, the policy underlying the doctrine "is the fairness of imposing liability for labor infractions where two [or more] nominally independent entities do not act under an arm's length relationship" (*id.* at 405).

As originally promulgated by the NLRB, the single employer doctrine sets forth four criteria to determine whether two or

---

1. ■ Because the Human Rights Law does not explicitly state that the four-employee minimum relates to subject matter jurisdiction (*see* Executive Law § 292), we hold that the four-employee requirement is not a jurisdictional requirement, but an element of a claim for relief (*see Arbaugh v Y & H Corp.*, 546 US 500, 515-516 [2006]).

more companies are sufficiently interrelated to constitute a single entity: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control of the entities in question (*see Radio & Television Technicians v Broadcast Service of Mobile, Inc.*, 380 US at 256; *Baker v Stuart Broadcasting Co.*, 560 F2d 389, 392 [1977]; *Arculeo v On-Site Sales & Mktg., LLC*, 425 F3d 193, 198 [2005]; *see also Cook v Arrowsmith Shelburne, Inc.*, 69 F3d 1235, 1240-1241 [1995] [analyzing the four criteria with respect to a parent and subsidiary relationship]). Of the four criteria, centralized control of labor relations is generally considered the most significant (*see Armbruster v Quinn*, 711 F2d 1332, 1337 [1983]; *Harris v Palmetto Tile, Inc.*, 835 F Supp 263, 267 [1993]).

The Second Circuit has neither adopted nor rejected the single employer doctrine (*see Arculeo v On-Site Sales & Mktg., LLC*, 425 F3d 193 [2005]; *Murray v Miner*, 74 F3d 402 [1996]). However, numerous other federal courts have applied the doctrine in determining whether employees of interrelated entities may be aggregated for purposes of determining whether an entity is an "employer" subject to title VII (*see e.g. Trevino v Celanese Corp.*, 701 F2d 397, 404 and n 10 [1983]; *Baker v Stuart Broadcasting Co.*, 560 F2d 389 [1977]; *Armbruster v Quinn*, 711 F2d at 1336-1338; *Westphal v Catch Ball Prods. Corp.*, 953 F Supp 475, 478 [1997]; *Harris v Palmetto Tile, Inc.*, 835 F Supp 263 [1993]).[2]

For example, in *Baker*, a sex discrimination action decided by the United States Court of Appeals for the Eighth Circuit (hereinafter the Eighth Circuit), the plaintiff alleged that radio station KRGI denied her employment on the basis of sex. The broadcast license for KRGI was held by Grand Island Broadcasting Company (hereinafter Grand Island). According to the plaintiff, an entity known as Stuart Broadcasting Company (hereinafter Stuart Broadcasting) provided management services for Grand Island, and James Stuart and Helen Stuart were the principal stockholders of both Stuart Broadcasting and

---

**2.** These federal cases discuss the 15-employee statutory minimum as an issue of subject matter jurisdiction, but predate the United States Supreme Court's decision holding that the 15-employee statutory minimum is not jurisdictional, instead constituting "an element of a plaintiff's claim for relief" which, thus, cannot be raised as a defense after a trial on the merits (*Arbaugh v Y & H Corp.*, 546 US at 515-516). Despite this distinction, the application and analysis of the single employer doctrine in these cases is still relevant to the matter at bar.

Grand Island. The plaintiff named Stuart Broadcasting, Grand Island, James Stuart, Helen Stuart, and Richard Chapin as defendants in the action. Upon the plaintiff's motion, the claims against James Stuart and Helen Stuart were dismissed. Thereafter, at the close of the plaintiff's evidence, the United States District Court for the District of Nebraska held that it lacked subject matter jurisdiction because the plaintiff failed to establish that each of the remaining defendants employed 15 employees, as required to be deemed an "employer" within the meaning of 42 USC § 2000e (b). Specifically, Stuart Broadcasting had only eight employees, while Grand Island had only 11 employees.

In reversing, the Eighth Circuit noted that the two entities were (1) both owned by James Stuart, Helen Stuart, and their family; (2) jointly managed by James Stuart and his family, all of whom also served on the boards of directors and as officers of both entities; and (3) under the control of Richard Chapin, who was president of and had day-to-day control of both entities (*see Baker v Stuart Broadcasting Co.*, 560 F2d at 392). Further, Stuart Broadcasting provided management services for Grand Island and issued policy manuals to Grand Island (*id.*). Based on such evidence of common management and common ownership, as well as evidence of "sufficient interrelation of operations" between the two entities, the Court concluded that the two entities should be treated as a single employer for purposes of title VII and, since collectively the two entities employed more than 15 people, remitted the case for further proceedings on the merits of the plaintiff's claims (*id.*).

In *Westphal v Catch Ball Prods. Corp.* (953 F Supp 475 [1997]), an age and sex discrimination suit, the defendant Catch Ball Products Corporation (hereinafter Catch Ball) contended that it was error for the jury to find that it met the 15-employee minimum by aggregating its six employees with the employees of two related entities, Orange Point and Gallup, which collectively had at least 15 employees. At the time of the plaintiff's termination, the three entities collectively had 20 employees (*id.* at 477-478, 478 n 3). In rejecting Catch Ball's argument, the United States District Court for the Southern District of New York noted that the evidence adduced at trial demonstrated that

> "Mr. Naraoka was the president of both Catch Ball and Orange Point, that he used the two companies to perform the same function in different parts of

the United States, that Orange Point from time to time had Catch Ball order goods on its behalf for delivery to a Catch Ball warehouse located near Orange Point, that the two companies split commissions, that the two companies spoke frequently on business matters, and that all goods purchased by both were shipped to Mr. Naraoka's Japanese company, Limousine International. [The plaintiff] offered testimony that Gallup was set up in conjunction with Orange Point to buy for retail and to ship to Japan as well. There was evidence that Mr. Naraoka referred to Limousine as 'the mother company' and ran both Orange Point and Catch Ball" (*id.* at 478-479 [citations omitted]).

Although implicitly finding that the plaintiff did not directly prove the element of centralized control of labor relations, the court noted that such criterion was nevertheless satisfied by considering together the evidence that Naraoka ran all three entities from Japan and that he dictated the manner in which the plaintiff was treated while she was a Catch Ball employee, all of which "permitted the inference that Mr. Naraoka controlled the labor and employment policies of all three companies" (*id.* at 479). In any event, the court noted, "the other evidence of common ownership and control and of interrelationship of operations was sufficient to permit the ultimate conclusion that the entities were a single employer" (*id.*).

In the instant matter, the evidence establishes that there was common management, common ownership, and common financial control of Argyle Realty, G-P Argyle, and DAL Management. Specifically, Theodore Dalmazio was the manager, chief operating official, and alleged "president" of Argyle Realty and the sole officer, director, and shareholder of G-P Argyle, the putative general partner of Argyle Realty. Dalmazio was also the majority shareholder and chief corporate officer of DAL Management, which managed properties owned by, among others, Argyle Realty.

The record also establishes that there was sufficient interrelation of operations between Argyle Realty and DAL Management. Although the complainant expressed uncertainty in her testimony as to whether she worked for DAL Management or Argyle Realty, she did identify Dalmazio as her employer and explain that the name "Argyle Realty" was displayed on her paychecks. Moreover, the complainant explained that, whenever she met with Dalmazio, it was at his personal office, the door of

which exhibited a "DAL Management" sign, but not an "Argyle Realty" sign.

The employment and activities of Tony Tardio, an employee of DAL Management, further illuminates the interrelation of operations between Argyle Realty and DAL Management. DAL Management employed Tardio as a manager of several of Argyle Realty's buildings. While the complainant testified that she was employed by Dalmazio, it is clear that Tardio acted as her supervisor as well. For example, when Tardio learned that the complainant was having other people perform some of her cleaning duties for her, he informed the complainant—an employee of Argyle Realty—that such practice was not allowed, because those other people were not employees of DAL Management.

Lastly and most significantly (see Armbruster v Quinn, 711 F2d at 1337; Harris v Palmetto Tile, Inc., 835 F Supp at 267), the evidence sufficiently establishes centralized control of labor relations between DAL Management and Argyle Realty. As manager and alleged "president" of Argyle Realty, Dalmazio both hired and fired the complainant. Further, while acting in his capacity as manager and alleged "president" of Argyle Realty, he conducted business at his personal office, which identified the office as only that of DAL Management. Such facts demonstrate that Dalmazio was arguably in control of both Argyle Realty and DAL Management, and rendered it difficult to distinguish between Dalmazio's control of DAL Management and that of Argyle Realty.

We therefore conclude that, pursuant to the single employer doctrine, it is appropriate to aggregate Tardio, the single employee of DAL Management in 1995, with the three employees of Argyle Realty in 1995, to satisfy the four-employee minimum required to deem Argyle Realty an "employer" under the Human Rights Law (see Executive Law § 292 [5]).[3]

The propriety of applying the single employer doctrine is further underscored by the Legislature's directive that "[t]he provisions of [the Human Rights Law] shall be construed liberally for the accomplishment of the purposes thereof" (Executive Law § 300; see e.g. Matter of Cahill v Rosa, 89 NY2d 14, 20 [1996] [collecting cases]; 300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 183 [1978]; New York Inst. of

---

3. In light of our determination, we need not address the Division's argument that Dalmazio should also be considered an employee of G-P Argyle, and that therefore, collectively, the three interrelated entities had at least five employees.

*Tech. v State Div. of Human Rights*, 40 NY2d 316, 324-325 [1976]; *cf. Arbaugh v Y & H Corp.*, 546 US at 515-516). The purpose of the statute is to ensure that "every individual within this state is afforded an equal opportunity to enjoy a full and productive life" (Executive Law § 290 [3]). We recognize that the purpose of the employee-numerosity requirement may be "to spare very small firms from the potentially crushing expense of mastering the intricacies of the antidiscrimination laws, establishing procedures to assure compliance, and defending against suits when efforts at compliance fail" (*Papa v Katy Indus., Inc.*, 166 F3d 937, 940 [1999], *cert denied* 528 US 1019 [1999]). However, where, as here, the discrimination occurred at the hands of Dalmazio, who is the manager and alleged "president" of the complainant's employer, Argyle Realty, the sole director of G-P Argyle, which is the putative general partner of Argyle Realty, and the majority shareholder in DAL Management, which manages Argyle Realty properties, such purpose is undermined since a refusal to apply the single employer doctrine would allow small employers to evade the Human Rights Law altogether (*id.* at 941).

Accordingly, we find that, pursuant to the single employer doctrine and in furtherance of the underlying purpose of the Human Rights Law and the liberal construction thereof, it is proper to aggregate the employees of Argyle Realty and DAL Management, which in 1995 collectively numbered four, and thus, Argyle Realty is deemed to be an "employer" within the meaning of Executive Law § 292 (5).

■ Turning to the merits, we find that the Commissioner's finding that the complainant was discriminated against in the terms, conditions, and privileges of her employment on the basis of her pregnancy, and thus on the basis of sex (*see* Executive Law § 296 [1]; *Rainer N. Mittl, Ophthalmologist, P.C. v New York State Div. of Human Rights*, 100 NY2d 326, 330 [2003]; *Elaine W. v Joint Diseases N. Gen. Hosp.*, 81 NY2d 211, 216 [1993]), is supported by substantial evidence (*see Rainer N. Mittl, Ophthalmologist, P.C. v New York State Div. of Human Rights*, 100 NY2d at 331; *300 Gramatan Ave. Assoc. v State Div. of Human Rights*, 45 NY2d at 180-181; *Matter of Andrew Naclerio Assoc., Inc. v Pradhan*, 45 AD3d 585, 587 [2007]). Under a substantial evidence review, courts "may not weigh the evidence or reject [the Commissioner's] choice where the evidence is conflicting and room for a choice exists" (*Matter of CUNY-Hostos Community Coll. v State Human Rights Appeal Bd.*, 59

NY2d 69, 75; *see Rainer N. Mittl, Ophthalmologist, P.C. v New York State Div. of Human Rights*, 100 NY2d at 331). Accordingly, upon finding a rational basis for the Commissioner's determination, the judicial function is exhausted (*see Matter of CUNY-Hostos Community Coll. v State Human Rights Appeal Bd.*, 59 NY2d at 75; *Matter of Manhattan & Bronx Surface Tr. Operating Auth. v New York State Exec. Dept.*, 220 AD2d 668, 668-669 [1995]; *cf. Matter of Robertson v Blue*, 289 AD2d 249 [2001]). We therefore do not address Argyle Realty's contention that the Commissioner should not have credited the complainant's testimony over the witnesses it proffered.

■ We further reject Argyle Realty's contention that the Commissioner's award to the complainant in the principal sum of $15,000 for mental anguish and humiliation was punitive and excessive.

The existence of a compensable mental injury may be established solely by the complainant's testimony (*see Cullen v Nassau County Civ. Serv. Comm.*, 53 NY2d 492, 497 [1981]). Moreover, because of this State's "strong anti-discrimination policy . . . , an aggrieved individual need not produce the quantum and quality of evidence to prove compensatory damages he [or she] would have had to produce under an analogous provision, and this is particularly so where, as here, the discriminatory act is intentionally committed" (*Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of Human Rights*, 35 NY2d 143, 147 [1974]). Rather, in general, "there must be some evidence of the magnitude of the injury [caused by the discriminatory conduct], to assure that the Commissioner's damage award is neither punitive nor arbitrary" (*Matter of New York City Tr. Auth. v State Div. of Human Rights*, 78 NY2d 207, 217 [1991]). Factors to consider include "the duration of a complainant's condition, its severity or consequences, any physical manifestations, and any medical treatment" (*id.* at 218). The relief imposed by the Commissioner need only be reasonably related to the discriminatory conduct (*id.* at 219; *Matter of Freudenthal v County of Nassau*, 99 NY2d 285, 291 [2003]). "Unless the award is so arbitrary and capricious as to constitute an abuse of discretion, it is not erroneous as a matter of law" (*Matter of New York City Tr. Auth. v State Div. of Human Rights*, 78 NY2d at 217, quoting *Matter of Imperial Diner v State Human Rights Appeal Bd.*, 52 NY2d 72, 79 [1980]; *see Matter of Town of Hempstead v State Div. of Human Rights*, 233 AD2d 451, 452 [1996]).

Here, the complainant testified, among other things, that after her termination, she was distressed by the decline in the maintenance of the buildings. She also described how, after being fired, she would wake up in the middle of the night and cry, and would awaken in the morning distraught and crying over her termination. Based on such testimony, we decline to disturb the Commissioner's award of damages for mental anguish and humiliation, as such award is reasonably related to Argyle Realty's discriminatory conduct and is thus neither punitive nor excessive (*see Matter of New York City Tr. Auth. v State Div. of Human Rights*, 78 NY2d at 218-219). We further note that the award does not deviate markedly from comparable awards for similar injuries (*see e.g. Matter of New York State Energy Research & Dev. Auth. v New York State Div. of Human Rights*, 50 AD3d 1361 [2008]; *Matter of Anagnostakos v New York State Div. of Human Rights*, 46 AD3d 992 [2007]; *Mittl v New York State Div. of Human Rights*, 307 AD2d 881 [2003]; *cf. Matter of A.S.A.P. Personnel Servs. v Rosa*, 219 AD2d 648 [1995]).

■ Lastly, contrary to Argyle Realty's contention, the Commissioner's determination to include predetermination interest with respect to the award of back pay, accruing from April 15, 1996, was not punitive, and was indeed consistent with the purpose of the Human Rights Law. Generally, "interest is not a penalty. Rather, it is simply the cost of having the use of another person's money for a specified period" (*Love v State of New York*, 78 NY2d 540, 544 [1991]). As the concept is specifically applied to the Human Rights Law, although that law "makes no specific reference to pre-determination interest, a liberal reading of the statute is explicitly mandated to effectuate the statute's intent . . . Clearly, a central concern of the Human Rights Law is to make such victims 'whole' [and] [p]redetermination interest awards are consistent with such concerns" (*Matter of Aurecchione v New York State Div. of Human Rights*, 98 NY2d at 26 [citations omitted]; *see also* Executive Law § 297 [4] [c] [iii]; § 300).

We further note that while title VII is similarly silent, federal courts have consistently held that predetermination interest is a necessary element to an award of damages for back pay to make whole a person who suffered past discrimination (*see e.g. Loeffler v Frank*, 486 US 549, 557-558, 557 n 5 [1988] [collecting cases]; *United States Equal Empl. Opportunity Commn. v Gurnee Inn Corp.*, 914 F2d 815, 819-820 [1990]; *Dailey v Societe Generale*, 889 F Supp 108, 113-114 [1995], *affd* 108 F3d 451

[1997]). Indeed, as the Second Circuit has noted, "it is ordinarily an abuse of discretion *not* to include pre-judgment interest in a back-pay award" (*Clarke v Frank*, 960 F2d 1146, 1153-1154 [1992], quoting *Donovan v Sovereign Sec., Ltd.*, 726 F2d 55, 58 [1984]; *see Saulpaugh v Monroe Community Hosp.*, 4 F3d 134, 145 [1993], *cert denied* 510 US 1164 [1994]).

Here, the award of predetermination interest on the award for back pay, from April 15, 1996, was appropriate to make the complainant whole. Given that the complainant incurred damages for each pay period between her unlawful termination by Argyle Realty in November 1995 and her commencement of new employment in September 1996, it was proper to calculate interest from April 15, 1996, as a "single reasonable intermediate date" (CPLR 5001 [b]; *see Matter of Boylan v Town of Yorktown*, 179 AD2d 753, 754 [1992]):

Accordingly, the petition is denied, the determination is confirmed, and the proceeding is dismissed on the merits. The cross petition is granted and the petitioner is directed to pay to the complainant, Ivette Rivera, the principal sum of $15,000 for mental anguish and humiliation, and the principal sum of $1,956 for back pay, with interest on the award for back pay accruing at the rate of 9% per annum from April 15, 1996.

COVELLO, J.P., ANGIOLILLO and CHAMBERS, JJ., concur.

Adjudged that the petition is denied, the determination is confirmed, and the proceeding is dismissed on the merits; and it is further,

Adjudged that the cross petition is granted and the petitioner is directed to pay the complainant the principal sum of $15,000 for mental anguish and humiliation, and the principal sum of $1,956 for back pay, with interest on the award for back pay accruing at the rate of 9% per annum from April 15, 1996; and it is further,

Ordered that one bill of costs is awarded to the New York State Division of Human Rights, payable by the petitioner.