**Elijah TURLEY, Plaintiff–Appellee,**

**v.**

**ISG LACKAWANNA, INC., ISG Lackawanna, LLC, Mittal Steel USA Lackawanna Inc., Larry D. Sampsell, Gerald C. Marchand, Thomas Jaworski, Mittal Steel USA, Inc. d/b/a/ ArcelorMittal USA, Inc., Mittal Steel USA Inc.,**

a/k/a/ ArcelorMittal Steel, Arcelor Mittal Lackawanna, LLC f/k/a/ ISG Lackawanna, LLC, Defendants–Appellants.

Docket No. 13–561.

United States Court of Appeals, Second Circuit.

Argued: Feb. 26, 2014.

Decided: Dec. 17, 2014.

Richard T. Sullivan, Harris Beach PLLC, Buffalo, N.Y. (Ryan J. Mills and Mary C. Fitzgerald, Brown & Kelly LLP, Buffalo, NY, on the brief), for Plaintiff–Appellee.

Evan M. Tager, Mayer Brown LLP, Washington, DC (Miriam R. Nemetz, Mayer Brown LLP, Washington, DC, and Lynn A. Kappelman and Dawn Reddy Solowey, Seyfarth Shaw LLP, Boston, MA, on the brief), for Defendants–Appellants.

Before: KATZMANN, Chief Judge, SACK, Circuit Judge, and RAKOFF,* District Judge.

* The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

1. We recognize that many of these disturbing acts are not unprecedented. *See, e.g., Tademy v. Union Pac. Corp.,* 614 F.3d 1132, 1135–38 (10th Cir.2008) (display of a noose); *Daniels v. Essex Grp., Inc.,* 937 F.2d 1264, 1266–68 (7th Cir.1991) ("KKK" scrawled on walls and

SACK, Circuit Judge:

This is an appeal from an amended judgment of the United States District Court for the Western District of New York (William M. Skretny, *Chief Judge*) filed February 5, 2013, on a multimillion-dollar jury award (reduced by the district court on remittitur) for compensatory and punitive damages for violations of state and federal anti-discrimination statutes, and for intentional infliction of emotional distress under New York law. The case before us on appeal involves a pattern of extreme racial harassment in the workplace.

The plaintiff, a longtime steelworker at a plant in Lackawanna, New York, endured an extraordinary and steadily intensifying drumbeat of racial insults, intimidation, and degradation over a period of more than three years. The demeaning behavior of the plaintiff's tormentors included insults, slurs, evocations of the Ku Klux Klan, statements comparing black men to apes, death threats, and the placement of a noose dangling from the plaintiff's automobile.[1] Supervisors' meager investigations and nearly total lack of action failed to stop the escalating abuse; instead, managers often appeared to condone or even participate in part in the harassment. The experience left the plaintiff psychologically scarred and deflated—injury for which a jury awarded $1.32 million in compensatory damages for the violation of statutes prohibiting a hostile or abusive work environment because of his race and the state tort of intentional infliction of emotional

black dummy hanging from doorway); *Williams v. N.Y.C. Housing Auth.,* 154 F.Supp.2d 820, 824–25 (S.D.N.Y.2001) (R. Carter, J.) (discussing in depth the horror associated with seeing a noose displayed in the workplace). We are unaware, however, of cases in our Circuit in which the defendants' behavior combines all of them.

distress. The jury also assessed $24 million in punitive damages, mostly against the employer and its parent company. The district court subsequently granted a motion for remittitur as to the punitive damages, which remittitur was accepted by the plaintiff, and reduced the punitive award by $19 million, to $5 million. The court also awarded the plaintiff substantial attorney's fees and costs.

The defendants appeal from this judgment and award. They do not seriously dispute the gravity of the underlying conduct, but they raise several procedural and substantive objections to the district court's findings on liability and to its damages award. We reject most of these challenges, finding no error in the district court's judgment concerning liability on the common-law and statutory claims or compensatory damages. We do, however, conclude that the punitive damages award, even after the remittitur in the district court, is excessive in light of the principles set forth in the prior case law of the Supreme Court and of this Circuit.

We are required to police closely the size of awards rendered in the trial courts within our Circuit. In recent opinions, we have addressed at length the individual and social harms associated with excessive awards of compensatory and punitive damages, many of which are relevant to this case.[2] A jury's assessment of damages based on intangibles such as emotional harm or the need for punishment injects an additional element of the immeasurable and subjective into the proceedings, which trial and appellate courts are expected to oversee with care. Excessive punitive damages also implicate a defendant's constitutional due process rights insofar as they impose a substantial punishment

without the safeguards, constitutional or otherwise, that attend criminal proceedings. Pursuant to these concerns, we scrutinize awards for fairness, consistency, proportionality, and, in the case of punitive damages, constitutionality.

After completing that review on the facts in the record before us, we conclude, first, that the jury's award for compensatory damages was permissible in light of the nature of the plaintiff's claims. Second, we conclude that the punitive damages were excessive. We will remand to the district court for imposition of a remittitur, requiring a new trial on the issue unless the plaintiff accepts an award to be calculated by the district court. The resulting damages, which will remain substantial, will be appropriate and sufficient to remedy the plaintiff's injury and to impose civil punishment on the defendants for their misbehavior.

## BACKGROUND

Elijah Turley was hired at the Buffalo-area Lackawanna Steel Plant in 1995, and remained in this job despite intense racial harassment until his employment was terminated when the plant closed its doors in 2009. During the period relevant to this litigation, the Lackawanna plant changed hands several times in a series of mergers and acquisitions that followed the 2003 liquidation of Bethlehem Steel, its longtime owner. For purposes of this appeal, it is sufficient to note that the plant was owned successively by three Delaware-based corporations (referred to here as "the employer" or "Lackawanna") whose names reflected those of three successive corporate parents (hereinafter "the parent compa-

2. See, e.g., Stampf v. Long Island R.R. Co., 761 F.3d 192, 205–11 (2d Cir.2014); Payne v. Jones, 711 F.3d 85, 96–106 (2d Cir.2013).

ny"; the last of which hereinafter "ArcelorMittal USA").[3]

### The Pattern of Racial Harassment

From 1997 onward, Turley worked as a process operator in the Lackawanna plant's "pickler"[4] department. Throughout the relevant time-period, he was the only African–American working regularly on his shift. Initially, he regarded the environment as pleasant and congenial, where workers treated each other "like a family." 2 Trial Tr. 199, 201. But things deteriorated rapidly in 2005, after Turley filed a grievance alleging that Thomas Jaworski, the manager in the pickler department, was giving favorable treatment to white employees. From that point onward, Turley testified, life in the pickler "was like hell." 2 Trial Tr. 205.

Throughout the remainder of his employment, Turley's co-workers frequently subjected him to racist epithets, degrading treatment, and, from time to time, outright threats. Co-workers declined to speak to him or interact with him socially on the job, by, for example, joining him for lunch. Jaworski, Turley testified, continually referred to him as "boy." 3 Trial Tr. 4–5. Another witness estimated that thirty percent of the workers in the department referred to Turley as "that [fucking nigger]."[5] 2 Trial Tr. 90–91. Unidentified coworkers broadcast monkey sounds over the plant's intercom system, also using the system to threaten Turley anonymously: "We['re] going to fucking kill you, fucking nigger, we're going to kill your fucking Jewish lawyer too." 3 Trial Tr.81.

Turley's workstation became a stage for repeated intimidation and harassment. Sometime in December 2005, he arrived at work to find a sign hanging from his workstation, printed with the words "dancing gorilla." Joint Stmt. of the Case ¶ 20(a). Days later, the initials "KK" were spray-painted on the wall near his workstation, and the phrases "King Kong" and

---

3. The district court described the series of ownerships as follows:

> Defendant ISG Lackawanna Inc., a wholly-owned subsidiary of International Steel Group Inc., purchased the steel galvanizing operation at the former Bethlehem Steel Plant in Lackawanna, N.Y. in May 2003. In January 2004, ISG Lackawanna Inc. became ISG Lackawanna LLC, a Delaware limited liability company. In April 2005, Mittal Steel Co. purchased International Steel Group, Inc., the parent of ISG Lackawanna LLC and shortly thereafter changed the name to Mittal Steel USA Inc. In June 2006, Mittal Steel Co. and Arcelor merged to create ArcelorMittal Inc. Shortly thereafter the name Mittal Steel USA Inc. was changed to ArcelorMittal USA Inc. ISG Lackawanna LLC was then a wholly-owned subsidiary of ArcelorMittal USA Inc. and changed its name to ArcelorMittal Lackawanna LLC.

*Turley v. ISG Lackawanna, Inc.*, 803 F.Supp.2d 217, 227–28 (W.D.N.Y.2011) (footnote and citations omitted). These entities will be referred to collectively as "the corporate defendants."

4. "Pickling" is a process "in which heavy scale on the surface of steel is removed by treating the steel with a hydrochloric acid solution." Timothy F. Malloy, *The Social Construction of Regulation: Lessons from the War Against Command and Control*, 58 Buff. L.Rev. 267, 325 & n. 199 (2010) (citing 62 Fed.Reg. 49, 052, 49, 053 (Sept. 18, 1997)).

5. Although others did, this witness did not use the words "fucking" and "nigger" at trial, substituting "F'ing" and "N" instead. 2 Trial Tr. 90. As is our ordinary practice in opinions such as these, we employ the actual words, albeit with distaste, for the purpose of reflecting precisely the facts of the case. The use of "nigger" "in the context of this opinion," in particular, "serves to describe accurately the severity of the behavior to which [the plaintiff] was subjected ... and not to trivialize the word's significant—and even unique—power to offend, insult, and belittle." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 38 n. 3 (2d Cir.2014).

"King Kong lives" appeared on the floor plate that Turley crossed to enter his booth. *Id.* ¶ 20(b). In July 2006, someone spray-painted the initials "KKK" on the wall near Turley's workstation; the initials appeared again in 2007. *Id.* ¶ 20(f). In late 2006, after Turley had filed two harassment complaints with the New York State Division of Human Rights, a face with tears was drawn on the wall in the pickler department. *Id.* ¶ 20(g). In 2008, a graffiti drawing of an ape-like man was found in a railroad car that had been parked inside the department.

Although many employees harassed and threatened Turley, a coworker, Frank Pelc, was responsible for some of the more extreme conduct. He addressed Turley as "you fucking black bitch," and "you fucking black piece of shit." 3 Trial Tr.26. Pelc would make monkey sounds when Turley tried to speak to him. *Id.* A worker who replaced Turley at his workstation at shift changes testified that, on a daily basis, the door handles and controls that Turley used would be covered with thick, black motor grease. When the worker complained about this to co-workers, Pelc said, "It must be that [']boon that's doing it," referring to Turley. 2 Trial Tr. 166. In May 2006, the same sort of grease was smeared all over Turley's chair in the processor booth. Once, Pelc told Turley: "[W]hen I see your black nigger ass on the outside, I'm going to fucking shoot you." 3 Trial Tr.28. When Turley reported the threat to management, "[t]hey laughed it off." *Id.*

The campaign of racial harassment intensified from 2005 into 2008. In one incident, on December 3, 2007, Turley was told to go check on his car, which had been vandalized several times in the past. Upon arriving, Turley found, dangling from his side-view mirror, a stuffed toy monkey with a noose around its neck.

### Supervisors' Actions

Because Turley brings this claim against his immediate employer, its corporate parent, and three individually named plant managers, rather than against the persons most directly involved in the daily abuse, his claim depends on the adequacy of the supervisors' response, or on their direct involvement in the harassment. Among the named defendants, Thomas Jaworski managed the pickler department from May 2003 to January 2007. Gerald Marchand was the plant's manager of human resources from May 2003 until March 2007. And Larry Sampsell was the plant manager of labor relations and security during the entire relevant time period.

Management was not wholly unresponsive to Turley's complaints. A foreman removed the "dancing gorilla" sign, and managers painted over some graffiti. After the "dancing gorilla" and "King Kong" incidents, Jaworski stated at a crew meeting that such conduct would not be tolerated. The situation nonetheless continued to worsen. Plant managers interviewed employees after many of Turley's complaints. After the 2007 incident with the stuffed monkey, the company hired a lawyer to conduct an investigation. And defendant Larry Sampsell, the manager of labor relations and security, installed lights in the parking lot. Sampsell also once arranged for a private investigator to pose as a contractor working in the pickler department in order to gather information, but the plan failed when employees discovered that the investigator was taking photographs.

On other occasions, however, supervisors were apparently unresponsive; to the contrary, they appeared to encourage some of the behavior. For example, a coworker accosted Turley while he was meeting with Sampsell and Marchand, shouting, "Shut up you fucking black cry-

baby bitch. Fuck you. You ain't shit. You're always crying like a bitch." 3 Trial Tr. 32. Turley testified that Sampsell and Marchand "just stood there," *id.*, and the employee was not disciplined for the verbal assault. In another incident, another coworker, David Pyanowski, apparently attempted to bait Turley into striking him, calling Turley a "black bitch," a "cry baby," and a "black piece of shit," and saying, "Why don't you get your b[l]ack ass out of here. Get the fuck out of here. We don't want you here anyway." 3 Trial Tr.82. When Turley and a union representative went to report the incident, they found Pyanowski and Sampsell laughing about the confrontation in Sampsell's office. Pyanowski was not disciplined for his behavior.

During the multiyear period in which this harassment took place, only two employees were disciplined for their roles in the abuse. Frank Pelc was suspended for three days for painting the "King Kong" graffiti in January 2006, and for another two days the following month for threatening to "deal with [Turley] on the outside." 4 Trial Tr. 19. In 2007, another employee received a five-day suspension for asking, in reference to Turley, "Do I have to work with that black man?" 2 Trial Tr. 110–11. The defendants have contended that their efforts to root out further culprits were frustrated by a "code of silence" among the workers, 1 Trial Tr.231, but they have not explained why employees such as Pyanowski went unpunished for hostile acts of which the supervisors were aware.

Several witnesses testified that management seemed uninterested in addressing the ongoing harassment. Turley testified that multiple calls to the company's complaint telephone line, "Alertline," met with no response or investigation. Company managers, including Sampsell, also were unresponsive to the efforts of local police to investigate the continuing course of threats and harassment. Detective Daniel Cardi testified that he repeatedly asked Sampsell and other plant managers for access to surveillance video and other records of the company's investigations. Each time, managers told Cardi that they would have to check with the company's legal department, and failed to follow up.

Sampsell did, however, begin to monitor Turley closely after the complaints started. After Turley had filed suit in federal court, Sampsell surreptitiously installed two cameras trained on Turley's workstation. Although Sampsell testified that the cameras were meant to detect the persons responsible for harassing Turley, it is undisputed that he did not inform Turley as to their presence; indeed, he initially denied it. After cameras were removed, a spray-painted eyeball appeared on the wall where one of the cameras had been.

Sampsell also retained a private investigator to run a background check on Turley. At trial, Turley's counsel reminded Sampsell that, in an earlier deposition, he had testified that he ran the background check because he was looking for a felony or other offense in Turley's history. Sampsell did not deny saying this, and admitted that his recollection would have been better at the time of the deposition than it was at the time of trial. The defendants did not object to this exchange, and it therefore became part of the record that the jury could consider.

### Effects on Turley

At trial, the union representative testified that between 2006 and 2008, inclusive, Turley, "was losing it." 1 Trial Tr. 191. Turley's psychologist noted that Turley suffered serious panic attacks and engaged in other abnormal behavior. The psychologist diagnosed Turley with a short-term adjustment disorder, depression, and a panic disorder. A psychiatrist further di-

agnosed him with post-traumatic stress disorder brought on by the workplace harassment. Several times, Turley had to be taken to the hospital as a result of the threats and harassment he experienced. He lost thirty pounds. Turley testified that, at the time of the trial, he did not sleep, struggled to relate to his children, did not socialize, and was frequently overcome by memories of his experience.

According to the district court:

> When Turley began work at the steel plant, he enjoyed his job and was a man full of confidence; he possessed a colorful and animated personality. He came in, as one witness put it, displaying his feathers like a "rooster." But the unyielding harassment took its toll. And by the time he left, he was broken and dispirited. The company had, again in the words of this witness, "cut the head off the rooster."

*Turley v. ISG Lackawanna, Inc.*, 960 F.Supp.2d 425, 434–35 (W.D.N.Y.2013) (internal citations omitted).

### Procedural History

Turley filed charges of discrimination with federal and state authorities in 2005 and 2006. On December 6, 2006, after exhausting his administrative remedies, Turley, through counsel, instituted this action in the United States District Court for the Western District of New York. The complaint alleges disparate treatment, retaliation, and the creation of a hostile work environment, in violation of 42 U.S.C. § 1981, Title VII, 42 U.S.C. § 2000e *et seq.*, and the New York Human Rights Law, N.Y. Exec. Law § 291 *et seq.*,[6] as well as a common-law claim for intentional infliction of emotional distress. In 2011, the district court granted partial summary judgment to the defendants as to retaliation and as to most disparate treatment claims, but allowed the plaintiff to proceed on his hostile work environment and emotional distress claims.[7] *Turley v. ISG Lackawanna, Inc.*, 803 F.Supp.2d 217 (W.D.N.Y.2011).

The trial lasted for three weeks, after which the jury deliberated for less than a

---

**6.** The principal differences among these three statutes are as follows. A plaintiff may bring an action against his or her employer under Title VII of the Civil Rights Act of 1964 for, *inter alia,* discriminatory conduct that manifests itself in a hostile working environment. *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). A racially charged hostile work environment also may give rise to a claim under section 1981, *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 68–69 (2d Cir.2000), a Reconstruction-era civil rights statute recognizing the right of all persons to make and enforce contracts on the same terms as white citizens. 42 U.S.C. § 1981. The substantive standards under these two statutes are similar, but, unlike Title VII, section 1981 permits a plaintiff, under certain circumstances, to sue persons other than employers. *See Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir.2004). Under New York law, a hostile work environment may give rise to statutory claims against employers and, in some circumstances, against non-employer individuals. *See Feingold v. New York,* 366 F.3d 138, 158 & n. 19 (2d Cir.2004) (explaining that individuals may be liable for aiding and abetting discriminatory conduct under N.Y. Exec. Law § 296(6)); *Patrowich v. Chem. Bank,* 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11, 12(1984) (per curiam) (suggesting that individuals may be subject to suit if they qualify as an "employer" within the meaning of the statute). Claims under the New York Human Rights Law are "generally governed by the same standards as federal claims under Title VII." *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 609 (2d Cir.2006).

**7.** The court also permitted the plaintiff to maintain his claim that he was given unequal pay because of his race. *Turley,* 803 F.Supp.2d at 238. The district court later granted the defendants' motion for judgment as a matter of law on this claim.

full day before reaching a verdict. They found all defendants liable to Turley for creating a hostile work environment, and Sampsell and Lackawanna liable on the emotional distress claim. Following a two-day trial on damages, the jury awarded a total of $1,320,000 in compensatory and $24,005,000 in punitive damages against the defendants, broken down by defendant.

After trial, the defendants moved under Federal Rules of Civil Procedure 50(b) and 59 for judgment as a matter of law, a new trial, or remittitur of damages, on several grounds. *Turley v. ISG Lackawanna, Inc.*, 960 F.Supp.2d 425, 433 (W.D.N.Y. 2013). The district court denied the defendants' motion for judgment as a matter of law, but partially granted the motion for a new trial based on its conclusion that the punitive damages award was excessive. *Id.* at 450, 456. The court ordered the new trial unless the plaintiff agreed for the punitive damages award to be reduced to a total of $5 million on remittitur, a figure the district court thought represented "the upper most limit permissible under the law." *Id.* at 453–54. The plaintiff accepted the reduction. A final breakdown of the awards is as follows:

| | Compensatory | Punitive |
|---|---|---|
| **Hostile Work Environment** | | |
| Corporate defendants | $1,000,000 | $4,000,000 |
| Sampsell | $25,000 | $0 |
| Marchand | $25,000 | $0 |
| Jaworski | $10,000 | $0 |
| SUBTOTAL | $1,060,000 | $4,000,000 |
| **Intentional Infliction of Emotional Distress** | | |
| ArcelorMittal USA Lackawanna Inc. | $250,000 | $998,750 |
| Sampsell | $10,000 | $1,250 |
| SUBTOTAL | $260,000 | $1,000,000 |
| TOTAL | $1,320,000 | $5,000,000 |

*See id.* at 456. The district court also awarded the plaintiff attorney's fees of $437,323.30 and costs of $32,711.42. *Id.*

The defendants appealed.

## DISCUSSION

The degree of racial intimidation and ridicule that pervaded Turley's workplace during the relevant period far surpassed any threshold necessary to demonstrate a hostile and abusive work environment. *See, e.g., Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The defendants do not argue otherwise.

Instead, they allege five errors in the verdict and judgment, for which the remedy demanded ranges from a reduction in damages to a new trial. First, the defendants contend that alleged errors in the jury instructions and verdict form prejudiced their case and warrant a new trial on the statutory harassment claims. Second, the parent corporation in this case, now named ArcelorMittal USA, Inc., argues that it was not the plaintiff's employer, and should not have been held liable as to those claims. Third, the defendants argue that, irrespective of whether the alleged conduct constituted racial harassment, it does not meet the strict standard set under New York law for intentional infliction of emotional distress. Finally, they dispute the size of both the compensatory and punitive damages awards.

### I. Jury Instructions and Verdict Form

We review a claim of error in the district court's jury instructions *de novo*,

disturbing the district court's judgment "only if the appellant shows that the error was prejudicial in light of the charge as a whole." [8] *Japan Airlines Co. v. Port Auth. of N.Y. & N.J.,* 178 F.3d 103, 110 (2d Cir.1999). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 153 (2d Cir.1997). We will not require a new trial "[i]f the instructions, read as a whole, presented the issues to the jury in a fair and even-handed manner." *Lore v. City of Syracuse,* 670 F.3d 127, 156 (2d Cir.2012).

The asserted error in this case concerns the court's instructions on the standard for employer liability in a hostile work environment claim. It is the plaintiff's burden to establish that the discriminatory conduct may be imputed to the employer. *See, e.g., Summa v. Hofstra Univ.,* 708 F.3d 115, 124 (2d Cir.2013). To succeed in that endeavor, the plaintiff can demonstrate that a supervisor used his or her authority "to further the creation of a discriminatorily abusive working environment," *Perry,* 115 F.3d at 153, or that the employer knew or reasonably should have known about harassment by non-supervisory co-workers, "yet failed to take appropriate remedial action," [9] *Duch v. Jakubek,* 588 F.3d 757, 762 (2d Cir.2009) (internal quotation marks omitted). The appropriateness of an employer's remedial action must "be assessed from the totality of the circumstances." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 65 (2d Cir.1998).

The defendants contend that the district court's instructions would have led the jury to conduct a different, and legally unsound, inquiry. The court instructed the jury that when a non-supervisory co-worker creates a hostile work environment, the employer will be liable only if the plaintiff proves that his "supervisor or successively higher authority knew ... or should have known ... of the hostile or abusive work environment and permitted it to continue by failing to take remedial action." 13 Trial Tr. 121–22. The defendants argue that this instruction would have allowed the jury to hold the company liable if any *single* supervisor or higher authority failed to adequately respond, on his own, to the harassment. If the defendants' interpretation is correct, then this instruction would constitute legal error because the employer's response to harassment must be assessed as a whole and in light of the totality of the circumstances. *See, e.g., Distasio,* 157 F.3d at 65.

We conclude, however, that when read in context, it is clear that the instruction does not contain the error that the defendants assert. In the paragraph immediately following the language in question, the district court explained:

> [A]n employer's response need only be reasonable under the circumstances.... Whether an employer's response was reasonable has to be assessed from the totality of the circumstances.... Factors to be considered in determining whether the response was reasonable include—okay, we're talking about reasonable employer response—the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's

---

8. We agree with the defendants that their challenge to the jury instruction and verdict form was properly preserved in the district court. *See* 14 Trial Tr. 3–4.

9. Other avenues are available for imputing harassment to an employer, but they are not relevant to this appeal. *See, e.g., Howley v. Town of Stratford,* 217 F.3d 141, 154 (2d Cir.2000) (noting that harassment may be imputed if the employer failed to provide an adequate avenue for redress).

response in light of the employer's resources, and the nature of the work environment. An employer's response to co-worker harassment is not unreasonable simply because it has not been successful in preventing further harassment.

Trial Tr. 13:122. This passage uses the phrase "employer's response" five times, and explicitly states that the jury must consider the totality of the circumstances. *Id.* It employs phrases, such as "the employer's resources," *id.*, that would make little sense unless the jury was being asked to consider the employer's response as a whole.

■■ We are not permitted to dissect a jury verdict by combing through a trial court's instructions seeking language that, when isolated from its context, might be or appear to be misleading. *See, e.g., Lore,* 670 F.3d at 156 (noting that a charge must be read "as a whole"); *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594, 600–01 (2d Cir.1978) (similar). "[A] jury charge should be examined in its entirety, not scrutinized strand-by-strand." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC,* 467 F.3d 107, 119 (2d Cir.2006) (quoting *Time, Inc. v. Petersen Publ'g Co.,* 173 F.3d 113, 119 (2d Cir.1999)). In the case at bar, the jury instruction, when examined as a whole, properly focused the jury's attention on the totality of the employer's response. The district court therefore did not "provide a misleading impression or inadequate understanding of the law." *Schwartz v. Liberty Mut. Ins.*

Co., 539 F.3d 135, 147 (2d Cir.2008) (internal quotation marks omitted).

■ The defendants also contend, with respect to the same issue, that a question on the verdict form was misleading and prejudicial. A verdict form "must be read in conjunction with the judge's charge to the jury." *Vichare v. AMBAC, Inc.,* 106 F.3d 457, 466 (2d Cir.1996); *Shah v. Pan Am. World Svcs., Inc.,* 148 F.3d 84, 96 (2d Cir.1998), *cert. denied,* 525 U.S. 1142, 119 S.Ct. 1033, 143 L.Ed.2d 42 (1999); *accord Lore,* 670 F.3d at 159–60. Here, the form was ambiguous with respect to whether any one manager's failure to respond adequately could create liability for a hostile work environment.[10] But, as we have explained, the district court's instructions made clear that the jury was to consider the totality of the employer's response to the harassment. These instructions thus clarified any ambiguity in the verdict form.

■ Even assuming *arguendo* that the jury instructions and the form had been erroneous, however, we do not think that the errors would have prejudiced the defendants. Defendants Sampsell, Marchand, and Jaworski undertook most of the several remedial actions in response to Turley's complaints, conducting some investigations, holding a few employee meetings, and taking security precautions, such as installing lights in the parking lot. The jury nonetheless decided that each of these defendants had either actively participated in the harassment or had failed to take adequate measures to stop or remedy it.

---

**10.** Under the heading "corporate liability," the jury form asked:

Has the plaintiff proven by a preponderance of the evidence that a supervisor with immediate or successively higher authority over the plaintiff created or permitted the hostile or abusive work environment by not taking reasonable action to address it?

J.A. 1679. The defendants argue that the form thus suggests that the company might be held liable if any single "supervisor ... permitted. the hostile or abusive work environment by not taking reasonable action to address it." *See id.*

We doubt that the presumably reasonable jury could have determined that the relatively meager and ultimately ineffective response efforts from a few other employees would have tipped the balance and led the jury to determine that the response, as a whole, was adequate.[11]

## II. Parent–Subsidiary Liability

 The parent company—now, as noted, named ArcelorMittal USA, Inc.—further argues that it cannot be held liable on the plaintiff's harassment claims because it was not the plaintiff's "employer," as that term is understood under the relevant statutes. We review *de novo* the district court's denial of judgment as a matter of law on this issue, although our review is "bound by the same stern standards" as the district court's. *Cross v. N.Y.C. Transit Auth.,* 417 F.3d 241, 248 (2d Cir.2005). We therefore view all evidence and draw all inferences in favor of the party opposing judgment as a matter of law, *Fabri v. United Techs. Int'l, Inc.,* 387 F.3d 109, 119 (2d Cir.2004)—in this case, the plaintiff. We will overturn a verdict only if we conclude that there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the appellant that reasonable and fair minded [jurors] could not arrive at a verdict against the appellant." *Gronowski v. Spencer,* 424 F.3d 285, 292 (2d Cir.2005) (internal quotation marks and brackets omitted). The record supporting the jury's finding on this issue is not so sparse as to require a reversal.

 The jury determined that both Lackawanna and its corporate parent were liable on the federal and state harassment claims.[12] Of course, as a general matter, the law "allows a corporation to organize so as to isolate liabilities among separate entities." *Murray v. Miner,* 74 F.3d 402, 404 (2d Cir.1996). Nonetheless:

> there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia,* the corporate form would otherwise be misused to accomplish certain wrongful purposes.

*United States v. Bestfoods,* 524 U.S. 51, 62, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). In the employment-discrimination context, we may look past the formal separation among corporate affiliates when "extraordinary circumstances" permit treating a parent and a subsidiary as a "single employer" for the purposes of applicable statutes. *Murray,* 74 F.3d at 404; *see generally* 1 *Fletcher Cyclopedia of the Law of Corporations* § 43.90 (2014).

 To determine whether, under Title VII,[13] a parent and subsidiary consti-

---

11. We also note that the jury found that the corporate defendants failed to prove that the company, as a whole, "exercised reasonable care to prevent and correct promptly any racially harassing behavior in the workplace." J.A. 1684.

12. Applying a different standard of parent-subsidiary domination, the jury concluded that the parent company was not liable on the emotional distress claim.

13. As far as we have been able to determine, we have not previously held that the "single employer" test applies to claims under 42 U.S.C. § 1981 as it does to Title VII claims. *Cf. Dewey v. PIT Telecom. Neth. U.S., Inc.,* 83 Fair Empl. Prac. Cases (BNA) 1792 (2d Cir. 1996) (unpublished summary order) (in claim alleging violations of Title VII, the Age Discrimination in Employment Act, and section 1981, applying the "single employer" test under the former two statutes but not the latter); *cf. Johnson v. Crown Enters., Inc.,* 398 F.3d

tute a single employer, we apply a four-factor test. *See, e.g., Brown v. Daikin Am., Inc.,* 756 F.3d 219, 226 (2d Cir.2014). "Under this test, 'a parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.'" *Id.* (brackets omitted) (quoting *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1240 (2d Cir.1995)). Although no one factor controls the analysis,[14] the second, "centralized control of labor relations," is the most significant. *See Cook,* 69 F.3d at 1240–41.

Our case law instructs us to apply the same four-factor inquiry to determine whether two or more entities constitute a "single employer" under the New York Human Rights Law. *Brown,* 756 F.3d at 226–28. Applying the test under both federal and state statutes serves the stated goal of the New York Court of Appeals "to resolve federal and state employment discrimination claims consistently."[15] *Aurecchione v. N.Y. State Div. of Human Rights,* 98 N.Y.2d 21, 25, 744 N.Y.S.2d 349, 771 N.E.2d 231, 233 (2002); *see also Hicks*

*v. Baines,* 593 F.3d 159, 164 (2d Cir.2010) (explaining that New York courts rely on federal case law in this area); *Argyle Realty Assocs. v. N.Y. State Div. of Human Rights,* 65 A.D.3d 273, 277, 882 N.Y.S.2d 458, 462 (2d Dep't 2009) (adopting the *Cook* test in a related context).

The single-employer inquiry is conceptually distinct from other theories of corporate veil-piercing. *Cf. Truck Drivers Local Union No. 807 v. Reg'l Imp. & Exp. Trucking Co.,* 944 F.2d 1037, 1046 (2d Cir.1991) (making a similar point in the context of labor relations). For example, under the single-employer test, a plaintiff need not demonstrate unlawful motive or any intent to use the corporate form to avoid contractual obligations. *See, e.g., Lihli Fashions Corp. v. Nat'l Labor Relations Bd.,* 80 F.3d 743, 748 (2d Cir.1996); *Trustees of Pension, Welfare & Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co.,* 995 F.2d 785, 788–89 (7th Cir.1993). And the plaintiff need not demonstrate that the parent company exercises "day-to-day control" over labor relations. *See Solis v. Loretto–Oswego Residential Health Care Facility,* 692 F.3d 65, 76–77 (2d Cir.2012). The plaintiff must

---

339, 343–44 (5th Cir.2005) (assuming without deciding that the single employer test applies to section 1981 cases). The defendants, however, accept that the "single employer" standard applies to the federal claims in this case, and nothing in their submissions suggests that the analysis would be different under another standard.

14. The third and fourth factors—common management and common ownership—are, in particular, "ordinary aspects of the parent-subsidiary relationship," which often may be of limited use in determining whether to treat two or more corporate affiliates as a single employer. *Meng v. Ipanema Shoe Corp.,* 73 F.Supp.2d 392, 403 (S.D.N.Y.1999).

15. The district court suggested that state courts apply a "slightly different" standard under the Human Rights Law, which focuses

on the parent company's ability to hire, fire, pay, and control the conduct of the plaintiff. *Turley,* 960 F.Supp.2d at 440 (citing *Hargett v. Metro. Transit Auth.,* 552 F.Supp.2d 393, 405 (S.D.N.Y.2008)). This approach, which appears in some earlier New York State Appellate Division cases, is drawn from general common-law principles for determining the existence of an employment relationship. *See, e.g., State Div. of Human Rights v. GTE Corp.,* 109 A.D.2d 1082, 1083, 487 N.Y.S.2d 234, 235 (4th Dep't 1985). Although we decide that the same standard controls our inquiry under both the federal and state statutes, we note that the defendants have not explained how the analysis would be different under this alternative formulation. *Cf. Turley,* 960 F.Supp.2d at 440.

show only that the corporate parent's involvement "is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions." *Cook,* 69 F.3d at 1241 (internal quotation marks omitted).

 In this case, there was some evidence that the parent company was directly and necessarily involved in decisions relating to the plaintiff's employment and to the course of harassment. It negotiated and entered into the collective bargaining agreement with the union, and it was this agreement that governed the plant's response to Turley's complaints. A 2007 harassment training seminar explained that all complaints must be reported to the corporate human resources department, and that any settlement that changes anyone's terms of employment must be approved by the corporate office. Employees were directed to report harassment to the "Alertline," a nationwide "hotline." Plant managers repeatedly stated that they were required to check with the corporate legal department in Chicago before providing information to assist police investigations concerning threats against Turley.[16] And Turley's employment ended when the parent company shut down the Lackawanna plant and sold its assets.

This evidence, along with additional facts recounted in the district court's opinion, *see Turley,* 960 F.Supp.2d at 437–40, provided a sufficient basis for the jury to conclude that the two companies constituted a single employer for the purposes of the federal and state statutory claims. We do not mean to imply that Lackawanna and its parent company would have consti-

tuted a single entity for all purposes. And, because our review is constrained by the strict standards that govern a motion for judgment as a matter of law, we do not imply that we would have necessarily treated these two entities as a single employer were we sitting as the trier of fact in this case. But because we find neither a "complete absence of evidence" supporting the jury verdict nor an overwhelming amount of evidence favoring the defendant, *see Gronowski,* 424 F.3d at 292, we will not disturb the jury verdict as to corporate liability.

## III. Intentional Infliction of Emotional Distress

The district court denied the defendants' motion for judgment as a matter of law on the plaintiff's claim for intentional infliction of emotional distress ("IIED"). *Turley,* 960 F.Supp.2d at 443–45. The defendants contend that the district court erred by permitting the jury's verdict on that claim to stand. Our review is *de novo,* within the strict limitations explained above. *See, e.g., Gronowski,* 424 F.3d at 292.

 The IIED tort is problematic. It provides a remedy for the damages that arise out of a defendant engaging in "extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 480 N.E.2d 349, 355 (1985); *accord* Restatement (Second) of Torts § 46 cmt. d (1965).[17] To prevail on such a claim, a

---

**16.** Because the plant did not have its own legal department, the managers seem necessarily to have been referring to the corporate office when they expressed the need to check with legal before cooperating with the police investigation.

**17.** Most if not all states recognized some version of the tort. *See Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666, 670 (1983) (citing for that proposition *Prosser on Torts* § 12, at 56 n. 81 (4th ed.1971)), *abrogated on other grounds by Welling v. Weinfeld,* 113 Ohio St.3d 464, 866 N.E.2d 1051 (2007); *Twyman*

plaintiff must establish that there was "extreme and outrageous conduct," that the conduct was undertaken with "intent to cause, or disregard of a substantial probability of causing, severe emotional distress," and that the conduct did in fact cause severe emotional distress. *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350 (1993); *accord Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir.2001).

Then–Chief Judge Kaye, writing for the New York Court of Appeals in *Howell*, explained the court's reasons for reading the IIED tort narrowly:

> Unlike other intentional torts, intentional infliction of emotional distress does not proscribe specific conduct (*compare, e.g.*, Restatement [Second] of Torts § 18 [battery]; *id.*, § 35 [false imprisonment]), but imposes liability based on after-the-fact judgments about the actor's behavior. Accordingly, the broadly defined standard of liability is both a virtue and a vice. The tort is as limitless as the human capacity for cruelty. The price for this flexibility in redressing utterly reprehensible behavior, however, is a tort that, by its terms, may overlap other areas of the law, with potential liability for conduct that is otherwise lawful. Moreover, unlike other torts, the actor may not have notice of the precise conduct proscribed.

*Howell*, 81 N.Y.2d at 122, 612 N.E.2d at 702, 596 N.Y.S.2d at 353 (citation omitted). Chief Judge Kaye went on to note that because of the extraordinary barriers that had therefore been erected by New York courts to recovery under an IIED theory, up until and including the time of the *Howell* opinion—April 5, 1993—"every one [of the IIED claims considered by this Court] ha[d] failed because the alleged conduct was not sufficiently outrageous." *Id.*, 612 N.E.2d at 702–703, 596 N.Y.S.2d at 353.

■ IIED, although providing relief for plaintiffs upon occasion post-*Howell*, remains a "highly disfavored [tort] under New York law." *Nevin v. Citibank, N.A.*, 107 F.Supp.2d 333, 345–46 (S.D.N.Y.2000). It "is to be invoked only as a last resort," *McIntyre v. Manhattan Ford, Lincoln–Mercury, Inc.*, 256 A.D.2d 269, 270, 682 N.Y.S.2d 167, 169 (1st Dep't 1998), *appeal dismissed sua sponte*, 93 N.Y.2d 919, 713 N.E.2d 418, 691 N.Y.S.2d 383, *leave denied*, 94 N.Y.2d 753, 722 N.E.2d 507, 700 N.Y.S.2d 427 (1999); *see also Abshier v. Sunset Recordings, Inc.*, 14 Civ. 3227, 3914(CM), 2014 WL 4230124, at *9, 2014 U.S. Dist. LEXIS 119742, at *23 (S.D.N.Y. Aug. 5, 2014) ("highly disfavored"); *Ibraheem v. Wackenhut Servs., Inc.*, 122 Fair

---

*v. Twyman*, 855 S.W.2d 619, 621–22 (Tex. 1993) ("Today we become the forty-seventh state to adopt the tort of intentional infliction of emotional distress as set out in § 46(1) of the Restatement (Second) of Torts."). Its blurry definition and vague outer limits differ somewhat from jurisdiction to jurisdiction.

The tort is sometimes referred to simply as "outrage." *See, e.g., Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1191 (9th Cir.), *cert. denied*, 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 26 (1989) (Wyoming law); *Leidholdt v. L.F.P., Inc.*, 860 F.2d 890, 892 n. 2 (9th Cir.1988) ("[Appellant] has conceded on appeal that under California and New York law

the tort of outrage is not separable from intentional infliction of emotional distress; we accordingly consider outrage and emotional distress as one claim, though they were separately pleaded in the complaint."). Indeed, as the Restatement (Second) of Torts has explained:

> Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 198 (Iowa 1985) (quoting Restatement (Second) of Torts § 46 cmt. d).

Empl. Prac. Cas. (BNA) 1590, 2014 WL 1873393, at \*14, 2014 U.S. Dist. LEXIS 64475, at \*41 (E.D.N.Y. May 9, 2014) ("extremely disfavored"); *Hogan v. J.P. Morgan Chase Bank,* 05 Civ. 5342(JS), 2008 WL 4185875, at \*4, 2008 U.S. Dist. LEXIS 118373 (E.D.N.Y. Sept. 4, 2008) (same).

As recognized in the New York case law, the perils of a generous rendering of IIED include its possible use in an attempt, successful or otherwise, to punish ill-considered but off-hand derogatory remarks; the poorly defined elements of and limitations on the tort; and the apparent prevalence in daily life, however unfortunate, of excruciatingly insulting speech causing hurt feelings. Meanwhile, other well-defined torts, such as libel, slander, and (outside New York State) false light invasion of privacy may be available to attack false, harmful speech while typically benefiting from an old—in some cases ancient—history of extensive case-by-case, statutory, and constitutional development. These torts may therefore provide carefully delineated remedies to address offending and injurious words without the lack of guidance, and the likelihood of untoward invasions of public speech or private conversation, that

may arise when IIED claims are not scrupulously limited.

Perhaps for these reasons, although the New York Court of Appeals has not set forth detailed guidelines for when the tort may be available, it has cautioned that a claim for IIED may not be sustainable "where the conduct complained of falls well within the ambit of other traditional tort liability." *Fischer v. Maloney,* 43 N.Y.2d 553, 557–58, 402 N.Y.S.2d 991, 373 N.E.2d 1215, 1217 (1978).[18] Other New York courts have applied this *dictum* to exclude claims for intentional infliction where a cause of action for defamation may be asserted on the facts of the case. *See, e.g., Brancaleone v. Mesagna,* 290 A.D.2d 467, 736 N.Y.S.2d 685 (2d Dep't 2002); *Herlihy v. Metro. Museum of Art,* 214 A.D.2d 250, 633 N.Y.S.2d 106 (1st Dep't 1995); *Butler v. Del. Otsego Corp.,* 203 A.D.2d 783, 610 N.Y.S.2d 664 (3d Dept. 1994).

More to the point, applying these principles, some New York courts have determined that plaintiffs may not bring claims for IIED when the conduct and injuries alleged give rise to a statutory claim for workplace discrimination.[19] *See McIntyre,*

18. An appellate court half a continent away recently summed up the gap-filling argument this way:

> [T]he tort of IIED is a "gap-filler" tort which was created for the "limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann–La Roche, Inc. v. Zeltwanger,* 144 S.W.3d 438, 447 (Tex.2004). The tort's clear purpose is to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied. The tort of IIED simply has no application when the actor intends to invade some other legally protected interest, even if emotional distress results. Thus, where the gravamen of a complaint is another

tort, IIED is not available as a cause of action.
*Young v. Krantz,* 434 S.W.3d 335, 344 (Tex.Ct. App. May 28, 2014) (some citations omitted).

19. There are at least two possible rationales for this approach. One would preclude IIED claims on the ground that they would permit an end-run around the New York legislature's prohibition on punitive damages for violations of the state Human Rights Law. *See Silberstein v. Advance Magazine Publishers, Inc.,* 988 F.Supp. 391, 392–94 (S.D.N.Y.1997). Another would preclude IIED claims in the face of valid statutory or common-law claims based on "the nature of the IIED tort itself" as a tort of last resort, rather than any independent effect wrought by the state statute. *See Hoffmann–La Roche, Inc. v. Zeltwanger,* 144 S.W.3d 438, 451 (Tex.2004) (Hecht, J., concurring).

256 A.D.2d at 270, 682 N.Y.S.2d at 169 (finding "no reason to apply" IIED where damages for emotional distress were available under New York Human Rights Law); *Conde v. Yeshiva Univ.*, 16 A.D.3d 185, 187, 792 N.Y.S.2d 387, 389 (1st Dep't 2005) (similar); *Baliva v. State Farm Mut. Auto. Ins. Co.*, 286 A.D.2d 953, 954, 730 N.Y.S.2d 655, 657 (4th Dep't 2001) (similar). *But see Funk v. F & K Supply, Inc.*, 43 F.Supp.2d 205, 218–20 (N.D.N.Y.1999) (finding that IIED claims may be brought alongside statutory claims); Martha Chamallas, *Discrimination and Outrage: The Migration from Civil Rights to Tort Law*, 48 Wm. & Mary L.Rev. 2115 (2007) (discussing the view that IIED is a tort of last resort).

The problematic nature of an IIED claim creates two difficult issues that have the potential to affect the outcome of this appeal. The first, were it squarely before us, would require us to decide whether, under New York law, the plaintiff was flatly barred from maintaining a common-law "gap-filler" claim for IIED alongside his statutory claim for workplace discrimination arising out of the same conduct and alleging the same injury. In order for us, or any other court, to decide the issue, it would, we think, be confronted with a choice between the general perils associated with the invocation of this tort and the substantial effect that ruling out IIED claims might have on the ability of some harassment plaintiffs to recover punitive damages which might otherwise appear to be warranted. The resolution of this question would thus "require value-laden judgments or public policy choices" and might be best addressed by certifying a question to the New York Court of Appeals. *Nguyen v. Holder*, 743 F.3d 311, 316 (2d Cir. 2014).

We are spared the necessity of addressing this difficult and consequential question in the present case, however, because the defendants did not argue below that the IIED tort is categorically unavailable in light of the plaintiff's pursuit of statutory remedies to support their motion for judgment as a matter of law. We therefore consider it to have been forfeited. *See, e.g., Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 264 (2d Cir.2003).[20]

The defendants principally contend, instead, that the record contains insufficient evidence to hold Sampsell and Lackawanna liable in light of the high hurdles presented by New York's rendition of the tort. As to this less categorical assertion, we conclude, to the contrary, that even after taking into account the gravity of the misbehavior that must be established before an IIED claim will be available to a plaintiff, there is sufficient evidence in the record in this case to support such a judgment.

Sampsell, the plant's head of security, was the only person the jury found liable on this claim, and his acts, the defendants contend, consisted largely of failing to respond appropriately to reports of harassment. The defendants argue that this kind of inaction cannot, as a matter of New York law, ever give rise to an IIED claim. We disagree with the defendants' characterization of the facts and the law.

**20.** To be sure, we may exercise our discretion to entertain a forfeited defense if the contention turns on a pure question of law. *See, e.g., Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 724 (2d Cir.2013). But we decline to do so here inasmuch as the defendants, even in their arguments to us on appeal, do not clearly ask that we do so, having only briefly and opaquely gestured in this general direction, and in light of the Pandora's box we might open by doing so. *See* Appellant's Br. at 24.

■■■■ Ordinarily, the failure to respond appropriately to complaints of harassment, on its own, will not be sufficiently egregious—"outrageous"—to amount to intentional infliction of emotional distress under New York law. *See, e.g., Sowemimo v. D.A.O.R. Sec., Inc.,* 43 F.Supp.2d 477, 492 (S.D.N.Y.1999); *Gray v. Schenectady City Sch. Dist.,* 86 A.D.3d 771, 773, 927 N.Y.S.2d 442, 445 (3d Dep't 2011); *Stallings v. U.S. Elecs., Inc.,* 270 A.D.2d 188, 188, 707 N.Y.S.2d 9, 10 (1st Dep't 2000); *Shea v. Cornell Univ.,* 192 A.D.2d 857, 858, 596 N.Y.S.2d 502, 504 (3d Dep't 1993). General bureaucratic unresponsiveness, lethargy, or a failure to understand the gravity of a situation, although objectionable, is rarely if ever considered so beyond the pale as to reach the extreme threshold necessary for an IIED claim. But, under New York law, an IIED claim does not turn on a distinction between action and omission. The ultimate question remains whether the conduct proven at trial, in light of all the circumstances, was "utterly intolerable in a civilized community." *Gray,* 86 A.D.3d at 773, 927 N.Y.S.2d at 445.

■■■■ Sampsell permitted the hate-ridden and menacing environment to persist for more than three years. On multiple occasions, he ignored, and failed to discipline employees responsible for, harassment of the plaintiff. He blocked the efforts of local police to investigate threats against Turley. Rather than address Turley's complaints, Sampsell set up a hidden camera that, whatever its intended purpose, in fact surveilled Turley while he worked. Although Sampsell was in charge of security for the plant, he did nothing when, in his presence, Turley was subjected to a vicious barrage of racial slurs. And when Turley and a witness went to Sampsell's office to report a particularly degrading verbal assault, they found Sampsell with the offending co-worker, laughing; perhaps, the jury could have concluded, as though he were a co-conspirator.

In these circumstances, Sampsell's behavior cannot be described as a simple failure to take timely action in response to a harassment complaint. If he failed to respond to one workplace complaint, however shocking the underlying behavior, that might not be sufficiently outrageous to constitute intentional infliction of emotional distress under New York law. Even a sluggish or incompetent response to two, three, or four complaints might not rise to clear the high bar set for this tort in this State. But Sampsell was a personal witness to the ongoing and severe indignity, humiliation, and torment to which the plaintiff was subjected over a substantial period of time—and he was in a position to do something about it. Instead, he continuously failed to respond for more than three years, blocking others' efforts to investigate serious threats, and, at times, seeming to encourage further harassment. On these facts, we see no error in either the jury's verdict, or the district court's decision to uphold the jury's finding that the defendant's conduct was outrageous, shocking, and beyond the bounds of decency so as to constitute tortious behavior.

■■■■ We also decline to disturb the jury's finding that Lackawanna also was liable for the IIED tort. An employer may be liable for the torts of an employee, provided the relevant behavior fell within the scope of employment. *See, e.g., Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278, 1281 (1979). Because it is usually motivated by something personal, harassment, however egregious, ordinarily does not fall within the scope of employment. *See, e.g., Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 756–57, 118 S.Ct. 2257, 141 L.Ed.2d

633 (1998); *Gray,* 86 A.D.3d at 773, 927 N.Y.S.2d at 445. That is not always the case, however. *Cf. Higgins v. Metro–N. R.R. Co.,* 318 F.3d 422, 426 (2d Cir.2003) (stating that "work-related outbursts" giving rise to IIED claim can be imputed, though they were not sufficiently outrageous to pass summary judgment in that case).

In this case, Turley's IIED claim was supported by evidence that Sampsell refused to use his position as head of plant security to address the ongoing harassment, punish those responsible, and cooperate with investigating authorities. These actions and omissions fell within Sampsell's assigned role in the company, and may fairly be imputed to his employer.

## IV. Compensatory Damages

We also reject the defendants' claim that the compensatory damages award exceeded what is permissible. The "calculation of damages is the province of the jury," *Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir.1990), and "we will not 'vacate or reduce a jury award merely because we would have granted a lesser amount of damages,'" *Lore v. City of Syracuse,* 670 F.3d 127, 177 (2d Cir.2012) (quoting *Nairn v. Nat'l R.R. Passenger Corp.,* 837 F.2d 565, 566–67 (2d Cir.1988)). We accordingly review a district court's decision on remittitur of compensatory damages for abuse of discretion.[21] *Id.*

This discretion does, however, have its limits. *Dagnello v. Long Island R.R. Co.,* 289 F.2d 797, 806 (2d Cir.1961). We have observed repeatedly that juries have wide latitude in setting compensation for damages, stressing that our review is "narrow," considering only "whether the award is so high as to shock the judicial conscience and constitute a denial of justice." *DiSorbo v. Hoy,* 343 F.3d 172, 183 (2d Cir.2003) (internal quotation marks omitted). But, when juries grant large compensatory awards for intangible and unquantifiable injuries, such as emotional distress, pain, and suffering, we are required to subject the trial court's discretion to "substantial constraints." *Stampf v. Long Island R.R. Co.,* 761 F.3d 192, 205 (2d Cir.2014) (quoting *Payne v. Jones,* 711 F.3d 85, 97–98 (2d Cir.2013)). Awards for mental and emotional distress are inherently speculative. There is no objective way to assign any particular dollar value to distress. Nonetheless, as we explained in discussing a claim of excessive punitive damages in *Payne,* "a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate." *Payne,* 711 F.3d at 93.

We must ensure proportionality, to control for the inherent randomness of jury decisions concerning appropriate compensation for intangible harm, and to reduce the "burdensome costs on society" of over-extensive damages awards. *Stampf,* 761 F.3d at 205 (noting that, if appellate courts regularly affirm large damages awards in the name of deference to the jury, "the baseline of reasonableness will be constantly forced upward").

The jury in the case at bar awarded Turley $1,320,000 for his past and fu-

---

21. "Under New York law, which is pertinent to the extent that [the plaintiff] was found entitled to recover under the [Human Rights Law], an award is deemed excessive 'if it deviates materially from what would be reasonable compensation.'" *Lore,* 670 F.3d at 177 (citation omitted) (quoting N.Y. C.P.L.R. § 5501(c)). Only that portion of the award allocated to the IIED claim is necessarily an award granted under state law; the harassment award, which did not distinguish between state and federal statutes, could be allocated entirely among Title VII and section 1981.

ture emotional distress, mental anguish, inconvenience, and loss of enjoyment of life. Most of the award was compensation attributed to the harassment claim, with $260,000 awarded under the claim for IIED. The defendants argue that the compensatory award was disproportionately large relative to jury awards in similar cases. They are correct insofar as there are few recorded cases in which the plaintiff claimed exclusively intangible harms and received a compensatory damages award of quite this magnitude. For example, in a 2012 case involving a similarly protracted and vicious course of harassment, we upheld an award of $1 million, which the district court had reduced from $1.25 million. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 673 (2d Cir.2012). But, as we noted at the outset of the opinion, the case before us appears to be unique, combining years of grotesque psychological abuse leading to a marked decline in Turley's mental health and well-being. He was hospitalized and diagnosed with, *inter alia*, post-traumatic stress disorder, depression, and panic disorder as a result of the harassment that he suffered. These injuries were extensive and well documented. The plaintiff in *Zeno*, by contrast, does not appear to have sought medical attention for his emotional injuries. *Id.* at 673.

Moreover, a compensatory award of this magnitude is not entirely without precedent. The Sixth Circuit in *Pollard v. E.I. DuPont De Nemours, Inc.*, 412 F.3d 657 (6th Cir.2005), affirmed a judgment granting, among other things, $1.25 million for IIED in a sexual harassment claim mirroring this one in terms of length and severity. *Id.* at 660–63, 666; *see also Pollard v.*

*E.I. DuPont de Nemours, Inc.*, 338 F.Supp.2d 865, 884 (W.D.Tenn.2003). Taking inflation into account, the Sixth Circuit's 2005 $1.25 million award exceeds the $1.32 million compensatory damages award in this case.[22]

Smaller damages awards in cases dating back ten or more years and involving less severe conduct also support affirming a larger award in this case. *See, e.g., Phillips v. Bowen*, 278 F.3d 103, 111–12 (2d Cir.2002) (sustaining $400,000 award for distress after sheriff's deputy was "shunned" by colleagues and mistreated for supporting an opposing candidate for sheriff); *Chopra v. Gen. Elec. Co.*, 527 F.Supp.2d 230, 247 (D.Conn.2007) (sustaining award of $500,000 in non-economic damages where retaliatory actions by employer caused extreme stress and poor health); *Town of Hempstead v. State Div. Human Rights*, 233 A.D.2d 451, 452, 649 N.Y.S.2d 942, 942–43 (2d Dep't 1996) (upholding $500,000 award for pattern of "extremely lewd and offensive conduct" over period of about nine months).

We thus acknowledge that the jury's compensatory award tests the boundaries of proportionality and predictability. But under the exceptional and egregious facts of this case, we conclude that the $1.32 million compensatory award was fair and reasonable. Recognizing also the deference that we owe to the district court, which was "closer to the evidence, and [ ] therefore in a better position to determine whether a particular award is excessive," *Gasperini v. Ctr. for Humanities, Inc.*, 149 F.3d 137, 141 (2d Cir.1998), we will not disturb that award.

None of this is to say that it was proper for the jury to consider or award damages

---

**22.** According to the Bureau of Labor Statistics' Inflation Calculator, $1.25 million in 2005 has the buying power of just over $1.5 million in 2014. *CPI Inflation Calculator,* United States Department of Labor, http://www.bls.gov/data/inflation_calculator.htm (last visited Dec. 15, 2014).

on the IIED claim in the first instance under the circumstances presented. As we have explained, we are not deciding whether New York law allows an IIED claim in the light of the simultaneous pursuit by the plaintiff of statutory causes of action for the same or similar injury to the plaintiff because the defendants did not pursue that argument.

## V. Punitive Damages

We agree with the defendants, however, that the punitive damages award exceeds the bounds of reasonableness. The jury assessed $20 million in punitive damages against all of the corporate defendants on the harassment claim, $4 million against Lackawanna on the IIED claim, and $5,000 against Sampsell on the IIED claim. The district court subsequently granted remittitur, which the plaintiff accepted, reducing the awards to $4 million, $998,750, and $1,250, respectively. We leave intact the award against Sampsell, but will remand the case to the district court for imposition of a remittitur as to the punitive award against the corporate defendants, consistent with the discussion that follows.

■■■■ We are required to review the district court's refusal to grant a more substantial remittitur as to the punitive damages award under federal common law, pursuant to the federal appellate courts' supervisory authority over trial courts. *Payne*, 711 F.3d at 97, 100. In such cases, "a degree of excessiveness less extreme than 'grossly excessive'" will support remanding for a new trial or remittitur of damages.[23] *Id.* at 97. We exercise relatively stringent control over the size of

punitive awards in order to ensure that such damages are "fair, reasonable, predictable, and proportionate," to avoid extensive and burdensome social costs, and to reflect the fact that punitive awards are imposed without the protections of criminal trials. *Id.* at 93–96; *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 499, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) (noting "the stark unpredictability of punitive awards"). Our review pursuant to these supervisory powers is for abuse of discretion in the denial of a reduction, but "the degree of discretion enjoyed by trial courts in these matters is relatively narrow." *Payne*, 711 F.3d at 100.

■■■■ Large punitive damages awards also implicate constitutional due process principles. *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 420, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994); *accord Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). We review *de novo* a district court's determination that a punitive damages award is not grossly excessive in violation of the United States Constitution. *Cooper Indus.*, 532 U.S. at 436, 121 S.Ct. 1678; *Payne*, 711 F.3d at 100.

■■■ Where, as here, the defendant challenges an award on both constitutional and non-constitutional grounds, we conduct our review first under federal common law, asking whether the district court abused its discretion in determining that the puni-

---

**23.** Our pre-*Payne* case law explained that we would disturb a punitive damages award only if it "shocks our judicial conscience." *See, e.g., Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir.1996). It appears that this standard con-

tinues to apply to our review under federal common law, although, in light of the panel's opinion in *Payne*, it may be that the judicial conscience is now "more easily shocked." *Payne*, 711 F.3d at 97.

tive damages award was appropriate. *Cf. Perez v. Z Frank Oldsmobile, Inc.,* 223 F.3d 617, 625 (7th Cir.2000) (explaining that constitutional limitations should "come into play only after the assessment [of punitive damages] has been tested against statutory and common-law principles"). If we uphold a punitive damages award, or if we order the award reduced, the resulting figure ultimately must survive constitutional scrutiny.

■ The Supreme Court has articulated three "guideposts" for reviewing punitive damages awards. They apply irrespective of whether our review is constitutional or supervisory in nature. *Payne,* 711 F.3d at 101 & n. 13. We consider: (1) "the degree of reprehensibility" associated with the defendants' actions; (2) "the disparity between the harm or potential harm suffered" and the size of the punitive award; and (3) the difference between the remedy in this case and the penalties imposed in comparable cases. *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

■ With respect to the first aspect of our review, the district court ably explained the gravity of the defendants' actions:

> The overt racist harassment lasted for more than three years. It did not improve with time; it escalated. Investigations were feeble and perfunctory; responses were cursory. Defendants exhibited an indifference to Turley's health, safety, and general well-being. The effect this had on Turley has already been detailed. It is enough to note here that it was deleterious and pervasive.

*Turley,* 960 F.Supp.2d at 451. These conclusions, wholly supported by the evidence, are sufficient to support a finding that the conduct at issue was egregious in the extreme. *See State Farm,* 538 U.S. at 419, 123 S.Ct. 1513 (setting out criteria for identifying reprehensibility).

■ The disparity between the punitive damages award and the already sizable compensation, however, gives us pause. As a general matter, the four-to-one ratio [24] of punitive to compensatory damages awarded is "close to the line of constitutional impropriety." *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513 (citing *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23–24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). And where, as here, the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases, "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* The district court's extensive damages judgment here therefore tests these constitutional limits.

■ Constitutional limitations aside, moreover, we are duty-bound to ensure that the award is "fair, reasonable, predictable, and proportionate." *Payne,* 711 F.3d at 93. Where the compensatory award is particularly high, as the one in this case assuredly was, a four-to-one ratio of punishment to compensation, in our view, serves neither predictability nor proportionality. As noted, this is particularly so where the underlying compensation is, as it is in this case, for intangible—and therefore immeasurable—emotional damages. Imposing extensive punitive damages on top of such an award stacks one attempt to monetize highly offensive behavior, which

---

**24.** The ratio between compensatory and punitive damages is 4:1 after the district court's remittitur.

effort is necessarily to some extent visceral, upon another. *Cf. Baker*, 554 U.S. at 500, 128 S.Ct. 2605 (noting the uncertainties associated with punitive damages); Cass R. Sunstein, Daniel Kahneman & David Schkade, *Assessing Punitive Damages (with Notes on Cognition and Valuation in Law)*, 107 Yale L.J.2071, 2131–33, 2135 (1998) (explaining that awards for emotional distress suffer from substantial unpredictability, deriving from uncertainties in translating "underlying moral judgments into dollar amounts"). Our commitment to reducing arbitrariness in damages awards, reining in excessiveness, and ensuring some degree of proportionality thus weighs in favor of enforcing a tighter relationship between the harm suffered and the punishment imposed.

A lower award also is necessary to bring the punitive damages in this case into alignment with comparable awards in other cases. Upon reviewing the Second Circuit and New York cases brought to our attention, it appears that punitive awards for workplace discrimination rarely exceed $1.5 million.[25] *See, e.g., Hill v. Airborne Freight Corp.*, 212 F.Supp.2d 59, 76–77 (E.D.N.Y.2002) (awarding $1 million, spread across multiple plaintiffs, for discrimination and retaliatory conduct); *Greenbaum v. Handelsbanken*, 67 F.Supp.2d 228, 269–71 (S.D.N.Y.1999) (Sotomayor, J.) (upholding $1.25 million award in sex discrimination case, noting that the defendants' actions, while malicious and deceitful, were "certainly less reprehensible than the worst imaginable violations"); *McIntyre*, 256 A.D.2d at 271, 682 N.Y.S.2d at 169 (remitting award to $1.5 million in case concerning harassment, retaliatory discharge, and IIED). A $5 million punitive damages award that is four times higher than the underlying compensation therefore appears to us to be excessive by comparison.

Attempting to take all of these factors into account, we conclude that a roughly 2:1 ratio of punitive damages to what, by its nature, is necessarily a largely arbitrary compensatory award, constitutes the maximum allowable in these circumstances. The district court's failure to impose a remittitur or grant a new trial if the plaintiff would not accept an award in such an amount constituted an abuse of discretion by imposing excessive punitive damages that undermine systemic goals of predictability and proportionality. *See*

**25.** The defendants contend that the award should be reduced far more drastically in light of damages limitations and civil penalties imposed by certain anti-discrimination statutes. For example, Title VII caps total recovery, including punitive damages, at $300,000. 42 U.S.C. § 1981a(b)(3). The New York Human Rights Law does not permit the recovery of punitive damages, but permits the imposition of civil penalties of up to $100,000. *See* N.Y. Exec. Law § 297(4)(c)(vi), (9). Although "a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue," *Gore*, 517 U.S. at 583, 116 S.Ct. 1589 (internal quotation marks omitted), these examples are not so powerful as to require drastic reductions in the punitive damages award. The punitive damages in this case were awarded under 42 U.S.C. § 1981, and Congress has made a considered judgment *not* to cap recovery under that statute. *See* 42 U.S.C. § 1981a(a)(1) (explaining that the damage limitations provision apply only to the extent that "the complaining party cannot recover under section 1981 of this title"). We therefore think the cases canvassed above provide a more apt guide than the statutory caps for gauging the appropriate degree of punitive damages in this case. *See Greenbaum v. Handelsbanken*, 67 F.Supp.2d 228, 271 (S.D.N.Y.1999) (Sotomayor, J.) (noting that, in light of analogous case law, applicable statutes, and the defendant's characteristics, it would not be unreasonable to expect a punitive damages award of $1 million or more for comparable misconduct).

*Payne,* 711 F.3d at 93–100. Our order with respect to the remittitur applies only to the portion of the punitive damages award assessed against the corporate defendants. In light of its modest size, the relatively limited award of $1,250 in punitive damages imposed on Sampsell does not, even after taking into account what may well be modest assets of this individual defendant, implicate limitations of a constitutional or non-constitutional nature.

■ Because the defendants also raise a constitutional challenge, we must decide whether a reduced award yielding an approximate 2:1 ratio of punitive to compensatory damages would be so grossly excessive as to fall outside the boundaries of due process. *See, e.g., State Farm,* 538 U.S. at 417, 123 S.Ct. 1513. As we have noted, the Supreme Court has cautioned that, when a compensatory award is particularly high, a 1:1 ratio between compensation and punishment may be the maximum award permitted by the Constitution. *Id.* at 425, 123 S.Ct. 1513. We do not think that a 1:1 ratio is required in the case at bar, though, in light of the extreme nature of the defendants' conduct. *Cf. Gore,* 517 U.S. at 575, 116 S.Ct. 1589 (explaining that reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award"); *Thomas v. iStar Fin., Inc.,* 652 F.3d 141, 149–50 (2d Cir.2011) (*per curiam*) (affirming a remittitur requiring an approximately 1.5:1 ratio in light of "the moderate level of reprehensibility of [the defendant's] conduct"). We think that in the aggravated circumstances of this case, an approximate 2:1 ratio is both permissible under the Constitution and consistent with the established policies adopted and adhered to by this Court. We are not called upon to, at least at this time, and do not, decide whether a more sizable punitive award would be constitutionally permissible.

We note, finally, a lurking question raised by this appeal; fortunately one we think we can avoid deciding, at least for the time being. We are remanding for a further remittitur to be imposed with respect to punitive damages. Remittiturs are a common procedure used by the courts to, in effect, reduce the amount of a damage award that the court concludes is impermissibly high.[26] They are, though, rather odd devices designed to accomplish indirectly what the Constitution generally prohibits judges from doing directly— overriding the verdict of a jury despite the Seventh Amendment's guarantee to the plaintiff of a jury trial in civil cases.

> *Remittitur* is defined as the process by which a court compels a plaintiff to choose between the reduction of an excessive verdict and a new trial. If the plaintiff rejects the specified reduction in the amount of damages, the court must grant a new trial to avoid depriving the plaintiff of the Seventh Amendment right to a jury trial; the court does not have the option of entering judgment for the reduced amount without the plaintiff's consent.

---

**26.** This practice goes back to the opinion of Justice Story sitting at circuit in 1822 in *Blunt v. Little* [, 3 F. Cas. 760 C.C.D. Mass. (1822) (No. 1578) ]. A number of Supreme Court decisions accepted Justice Story's view uncritically and the power of the court to set remittitur has been uniformly accepted by the lower courts.

11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2815, p. 160 (3d ed.1993); *see also id.* at p. 163 (discussing the opinion by Justice Sutherland in *Dimick v. Schiedt,* 293 U.S. 474 [55 S.Ct. 296, 79 L.Ed. 603] (1935), a case addressing the forbidden practice of additur, which "showed the shaky foundation on which the remittitur practice stands").

Moore *et al.*, *Moore's Federal Practice* § 59.13[2][g][iii][A], p. 59–82 (3d ed.2013) (footnote omitted).

In this appeal, we decide the issue of what we view, in our supervisory function, as excessive punitive damages, concluding with a judgment requiring imposition of a remittitur by the district court.[27] We leave for another day the question of whether, if we decided that the punitive award was excessive on constitutional grounds, we could or would directly order a reduction in the punitive award rather than using the remittitur procedure. We think this might well be permissible because, unlike in the usual case of remittitur, we would be concluding that the award was *unconstitutional*, rather than unduly high. Its unconstitutionality might well give us the ability to directly order a reduction of the award pursuant to the due process guarantees of the Fifth Amendment despite the Seventh Amendment civil jury guarantee.[28] Depending on the remittitur proceedings on remand, this issue may well be or become moot in the case before us. We therefore do not decide it, at least at this time.

## CONCLUSION

For the foregoing reasons, we VACATE the district court's punitive damages award, and REMAND for imposition of a remittitur ordering a reduced punitive damages award against the corporate defendants or, if the plaintiff does not accept the reduced award, a new trial. The judgment of the district court is in all other respects AFFIRMED.

---

27. The Circuit may impose remittitur directly, but in this case we choose to leave the precise calculation of punitive damages to the district court's discretion.

28. The observation in *Moore's Federal Practice*, anchored by its citations to judgments in other Circuits, that "when a court finds that a damages award is excessive as a matter of law because it exceeds due-process limits, a reduction of the award to the constitutional maximum does not interfere with the right to a jury trial, and the court need not offer the plaintiff the option of a new trial," Moore *et al.*, *Moore's Federal Practice* § 59.13[2][g][iii][A], p. 59–83 (3d ed.2013), seems to us, at first blush, to be persuasive. We note, though, that at least one panel of this Court in a similar situation nonetheless imposed a remittitur to vindicate a defendant's due process right to reduce an unconstitutionally high punitive award. *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 125 (2d Cir.2004) (holding that the punitive damages award was unconstitutionally high, but nonetheless ordering "a new trial on punitive damages unless plaintiffs agree to a reduction, in an amount to be determined by the district court, in their punitive damages").